2004 OK 56

**CITY OF MIDWEST CITY, a body corporate and politic, and a duly constituted and qualified municipality, Plaintiff/Appellee,**

**v.**

**HOUSE OF REALTY, INC.; Robert J. Barton; Pamela L. Barton–Stober; Douglas D. Stober; Kathy L. Givens; Sharlette R. Madison; Jeffrey C. Tackett; Harlan Drake; Phillis Casey; Keith Casey; Larry Phillips; Iris Jones; Donna Gunter; Diane Frith; Richard Spriggs; Leonard Sewell; Arthur Lewis; Danny Watson; Myron Nicewander; William Klukoske; Lawrence Hawkins, Defendants/Appellants.**

City of Midwest City, a body corporate and politic, and a duly constituted and qualified municipality, Plaintiff/Appellee,

**v.**

Shirley A. "Goetsch" Barton, Trustee of the Shirley A. "Goetsch" Barton Revocable Trust, dated September 23, 1992; Robert J. "Bob" Barton, Trustee of the Robert J. "Bob" Barton Revocable Trust, dated September 23, 1992, Defendants/Appellants.

Nos. 100,064, 100,065.

Supreme Court of Oklahoma.

June 29, 2004.

James R. Waldo, Mock Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, OK, for Plaintiff/Appellee.

Katherine E.F. Bolles, City Attorney, City of Midwest City, Midwest City, OK, for Plaintiff/Appellee.

Terry Guy Shipley, Norman, OK, for Defendants/Appellants.

EDMONDSON, J.

¶ 1 The central issue in this controversy is whether a municipality's authority to condemn property for economic redevelopment and blight removal is limited to special statutes expressly giving such authority, or in the alternative whether a municipality may condemn property for blight removal and economic development pursuant to a general power of eminent domain. In this controversy a municipality and a public trust have jointly created, funded, and operated an economic redevelopment project that included the removal of blighted property. We hold that a municipality may not use a general power of eminent domain for the purpose of economic development and blight removal when it is acting jointly with a public trust. This is so because the Legislature has provided specific procedures for economic redevelopment and blight removal by the joint conduct of municipalities and public trusts.

¶ 2 The City of Midwest City and the Midwest City Memorial Hospital Authority have a joint plan to redevelop approximately eighty acres of land on S.E. 29th Street in Midwest City. The eighty acres consist of approximately two-hundred separate parcels known as the City of Midwest City Downtown Redevelopment or "Project Area." Midwest City Hospital Authority agreed to advance funds to the City in an amount not to exceed $30,000,000 (thirty million dollars) for acquiring the property necessary for redevelopment. The members of the City Council for Midwest City are also the Trustees of the Midwest City Memorial Hospital Authority.

¶ 3 The Authority provides funds to Midwest City to acquire title to some of the property using condemnation proceedings. Once the City obtains the property it transfers title to the Hospital Authority. The Hospital Authority has entered into a contract with a private developer. That contract provides that the Hospital Authority will ground lease the Project Area, which will then be subleased to tenants, primarily retail establishments. In summary, the redevelopment is a project of the Midwest City Memorial Hospital Authority, and the City is exercising a power of eminent domain to supply property to the Authority in those circumstances where the landowners decline to sell their property.

¶ 4 The House of Realty, Inc., declined the offer made by Midwest City for its property. The offer did not include any relocation expenses or business losses. The House of Realty has been located in its present location near the corner of South Air Depot and 29th Street for more than thirty years. In an effort to stay at its location near Tinker Field, House of Realty offered to transfer title to all of its property, except for its office building, and then remodel that building to be consistent with the architecture of the new construction. House of Realty also offered to add parking and storage areas, and to make other improvements consistent with the new construction and the Project. The City Manager of Midwest City initially expressed approval of this plan, but the City of Midwest City subsequently rejected this offer.

¶ 5 The House of Realty provides rental services to military and other personnel employed at Tinker Field. The parties stipulated that these rental services constitute a substantial part of the total business of House of Realty, and that "Relocation of their offices would be ruinous to their business of providing rental services to military and other personnel who work at Tinker Field." This military facility is located south of 29th Street, and one of its entrances is located on South Air Depot, a short distance from the House of Realty. The City has

stipulated that its officials have "searched the entire City for a comparable location [to be occupied by the House of Realty] and have found none." A portion of the property the City seeks to condemn is also used by a restaurant.

¶ 6 Midwest City brought a condemnation proceeding against the House of Realty, Inc. (Landowners). The City's petition to condemn the property stated that "Plaintiff has deemed advisable and necessary to own, in fee simple, certain private properties for economic development purposes and uses incidental thereto." Attached to the City's Petition is a Resolution stating that "economic development is a legitimate public purpose for which municipalities can condemn private property."[1] Both Petition and Resolution are silent on whether the property the City seeks to condemn is blighted, or if it possesses some attribute justifying the exercise of an eminent domain power other than economic development. Two months later the City filed an amended petition stating the same language that certain private properties were necessary for economic development purposes.

¶ 7 The City argued that it could exercise a general power to condemn lands pursuant to 27 O.S.2001 § 5,[2] and that its stated purpose of economic development was a public purpose that justified the exercise of such power. Commissioners were appointed to appraise the property. Midwest City filed a brief in support of its motion to instruct Commissioners, and stated that it was relying upon 11 O.S.2001 § 22–105[3] as authority for eminent domain, and further argued that 11 O.S.2001 § 22–104[4] did not apply.

---

1. Petition by City of Midwest City (June 28, 2001), Exhibit B, Resolution No.2001–01, January 23, 2001, O.R. at 6, Okla. Sup.Ct. No. 100, 064.

2. 27 O.S.2001 § 5:

   Any county, city, town, township, school district, or board of education, or any board or official having charge of cemeteries created and existing under the laws of this state, shall have power to condemn lands in like manner as railroad companies, for highways, rights-of-way, building sites, cemeteries, public parks and other public purposes.

3. 11 O.S.2001 § 22–105:

   Private property may be taken for public use, or for the purpose of giving a right-of-way or other privilege for any necessary purpose, in the manner provided by law; but in every case the municipality shall make adequate compensation to the person or persons whose property shall be taken or injured thereby as provided by law.

4. 11 O.S.2001 § 22–104:

   Every municipality shall have the right to:
   1. Engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from the municipality and to do all things necessary and proper in the discretion of the governing body of the municipality pursuant to the authority granted to it by the Constitution and laws of this state to maintain said business or enterprise for the benefit of the municipality;
   2. Acquire, own, and maintain, within or without its corporate limits, real estate for sites and rights-of-way for any municipal purpose including but not limited to public utility and public park purposes, and for the location thereon of waterworks, electric light and gas plants and other facilities for generating or distributing energy, ports, airports, hospitals, quarantine stations, garbage reduction plants, pipelines for the transmission and transportation of gas, water, stormwater, and sewerage, and for any plant for the manufacture of any material for public improvement purposes and public buildings;
   3. Exercise the right of eminent domain for any municipal purpose, within or without its corporate limits, and to establish, lay, and operate any plant or pipeline upon any land or right-of-way taken pursuant to eminent domain. Any business or profession which is affected by the right of eminent domain as exercised pursuant to the provisions of this section shall be considered as a property right of the owner thereof and proper allowance therefor shall be made;
   4. Exercise the right to manufacture any material for public improvement purposes, and to barter or exchange the same for other material to be used in public improvements in the municipality, or to sell the same;
   5. Issue and sell bonds subject to and by virtue of the provisions of the Constitution of this state and in the manner and form provided by law in order to raise the monies to establish and maintain public utilities, parks, and improvements;
   6. Sell or lease to any consumer or corporation, within or without its boundaries, the commodities and services supplied by such municipally owned or controlled public utility, business enterprise, or improvement and to enter into such short- or long-term contracts, agreements, and stipulations and do all things necessary and proper to further the capability of the municipality pursuant to the authority granted to it by the Oklahoma Statutes and the Constitution of this state to provide said commodities and services as

¶ 8 Landowners argued that the City possessed an eminent domain power to take their land for economic redevelopment if the City exercised such power pursuant to the Urban Renewal Act (11 O.S.2001 § 38–101– § 38–123), or the Neighborhood Redevelopment Act (11 O.S.2001 § 40–101– § 40–115). Landowners argued that the City had not followed the Neighborhood Redevelopment Act, that 27 O.S.2001 § 5 did not provide authority for the City to condemn property for economic redevelopment, that pursuant to 11 O.S.2001 § 22–104(3) Landowners were entitled to additional compensation (including business losses and relocation expenses), and that the City had not met requirements for condemning the property. Midwest City disagreed and stated that it relied upon 27 O.S.2001 § 5 as authority to condemn the property. The City stated that it need not follow the Urban Renewal Act or the Neighborhood Redevelopment Act.

¶ 9 On January 25, 2002, an evidentiary hearing was held in the District Court on the motion for, and objection to, instructions to the Commissioners. The testimony of the Development Services Director for the City of Midwest City described the project. When asked why the City "elected not to follow any of the special statutes," he explained that one reason was that the Authority was providing a source of funding for the City. His testimony also revealed that the Urban Renewal and Neighborhood Redevelopment Acts have procedures that involve certain public hearings, and the City would be required to make certain determinations of conditions of the property in order to officially determine that it was blighted for the purposes of those statutes. Hearings and a determination that blight was present would, pursuant to these special statutes, precede any condemnation proceedings in a District Court.

¶ 10 The Development Services Director stated that the City decided to develop the property in the manner it did because the City thought that economic development was a legitimate public function, the Hospital Authority was making funds available for the project, and the property didn't meet all of the definitions for blighted conditions. The Director agreed with counsel that Urban Renewal or Neighborhood Redevelopment Acts have procedures that allow the public to be involved with the process that determines whether property is blighted. He then explained that the City did give notice to the public of its meetings on the project. He stated that people attending the meetings would have known that the City "was acquiring property in the area."

¶ 11 In summary, the City argued that economic redevelopment was a public purpose, and that a municipality such as Midwest City could exercise eminent domain for a public purpose. Thus, according to the City, it could exercise eminent domain to condemn property if the purpose of the taking was economic development. The City argued that acts such as the Urban Renewal Act or the Neighborhood Redevelopment Act were possible alternatives for municipalities to use in redevelopment, but neither were required when the City itself, as opposed to a public trust, was the entity exercising eminent domain. Landowners asserted that specific statutes on economic development must be followed by a municipality when it sought to exercise eminent domain for economic development.

¶ 12 In March of 2002 the Report of Commissioners was filed, and they determined that just compensation for the condemned property was $375,000.00. Landowners objected and challenged the City's authority to condemn the property pursuant to 27 O.S. 2001 § 5. They also argued that the City did not make any findings that taking the property was necessary, or that the property was blighted. Landowners also objected to the amount of compensation.

---

may be deemed appropriate by the governing body of the municipality;

7. Lease at a stipulated rental rate any public improvement or utility from any person, firm, or corporation which will contract to furnish the same. Any such rental contract shall reserve for the municipality the option to purchase the improvement or utility in the future; and

8. Exercise powers necessary to carry out the purpose of the Local Development Act as set forth in Section 854 of Title 62 of the Oklahoma Statutes.

¶ 13 Then, while the condemnation proceeding was pending, the City of Midwest City passed two resolutions linking its Project to specific redevelopment statutes. On April 9, 2002, the City of Midwest City passed Resolution No. 2002–05. The Resolution states that the City and the Hospital Authority "wish to facilitate reinvestment in historic downtown Midwest City in accordance with the Local Development Act, 62 O.S. §§ 850 *et seq.*, as amended." Also on April 9, 2002, the Hospital Authority passed Resolution HA 2002–01 stating the same language.

¶ 14 On April 23, 2002, the City passed Resolution 2002–07. The Resolution states that the City and the Authority are "undertaking concurrent actions to facilitate reinvestment in historic downtown Midwest City in accordance with the Local Development Act, 62 O.S. §§ 850 *et seq.*, as amended." This Resolution states in part:

1. Pursuant to the Local Development Act, 62 O.S. §§ 850, et seq., as amended, the City hereby authorizes the Authority in connection with the Midwest City Downtown Redevelopment Project to exercise the power to: cause the Project Plan to be prepared; to submit the proposed Project Plan to the City . . .

2. The Authority shall prepare and submit the Project Plan to the City.

3. Upon submission by the Authority, the City shall formally consider adoption of the Project Plan.

One month later on May 28, 2002, the City of Midwest City passed Resolution No. 2002–11. This Resolution determined that the Project Area is blighted, and stated that the City Council was authorized to perform the redevelopment pursuant to 11 O.S.2001 § 22–104.

¶ 15 On August 27, 2002, the City passed Ordinance No. 2852. The ordinance states in part that:

SECTION 10. Acquisition of the redevelopment project property within the Increment District by the City of Midwest City is authorized and confirmed pursuant to its general powers to exercise the right of eminent domain for any municipal purpose and to carry out the purposes of the Local Development Act in accordance with 11 Okla. Stat. § 22–1043(3), (8).

SECTION 15. The Midwest City Hospital Authority, a public trust, is designated as the public entity authorized to carry out and administer the provisions of the Project Plan and to exercise all powers necessary thereto except those powers reserved to the municipal governing body by this ordinance and the Local Development Act at 62 Okl. Stat. § 854.

In October of 2002 the City of Midwest City filed an amended petition that requested the appointment of Commissioners. The petition asserted that the City possessed eminent domain to take the property pursuant to 11 O.S.2001 § 22–104(3) & (8) for purposes of the Local Development Act. The City later filed a motion for the court to confirm the previous Report made by the Commissioners.

¶ 16 The trial court overruled the objections to the Report of the Commissioners and confirmed the Report. Landowners appealed. We retained the appeal and heard oral argument en banc. The trial court's order in City of Midwest City v. House of Realty, Inc., is on appeal in Okla. Sup.Ct. No. 100,-064. In a companion case, Okla.Sup.Ct. No. 100,065, Midwest City brought a similar condemnation proceeding to acquire property located in the Project Area. Landowners requested that business losses be included in the amount of the award. They asserted that their property was used as rental property, and that such use should be included in the determination of fair market value. They also requested that relocation expenses be included. They challenged the City's right to condemn the property. At oral argument before the Court *en banc*, Defendants in both appeals stated that they seek reversal of the trial court's confirmation of the amount of the award, and a reversal of the trial court's action in overruling their objection to the City's taking. We have treated the two appeals as companion appeals, and now consolidate them for the sole purpose of one opinion on the issue of the City's authority to condemn the property for blight removal and economic redevelopment by a public trust.

## II.

¶ 17 The Legislative power of the State includes the power of eminent domain. *Berman v. Parker,* 348 U.S. 26, 31–32, 75 S.Ct. 98; 99 L.Ed. 27 (1954). A municipality, the City of Midwest City claims to possess this power by reason of the Local Development Act and 11 O.S.2001 §§ 22–104(3) & (8). The stated purpose of the Local Development Act, 62 O.S.2001 §§ 850–869, is to implement Article 10 § 6C of the Oklahoma Constitution. The purposes of the Act are served by a municipality (1) granting incentives and exemptions from taxation, (2) allowing apportionment of an increment of local taxes and fees, (3) planning and carrying out development and redevelopment, and (4) using local taxes and fees for financing.62 O.S. 2001 § 851.[5] Section 851 does not contain any reference to eminent domain. Article 10 § 6C also does not contain any reference to a power of eminent domain.[6]

¶ 18 The City of Midwest City agrees that the Local Development Act does not contain any express grant of eminent domain authority to municipalities. The City argues that its authority to exercise eminent domain power when executing provisions of the Local Development Act is implied in § 854 of the Act which lists additional powers granted to municipalities and states in part that:

> In addition to any other powers conferred by law, a city, town or county may exercise any powers necessary to carry out the purpose of this act, including power to: . . . .

5. 62 O.S.2001 § 851:

The Local Development Act shall serve to implement and execute Section 6C of Article X of the Oklahoma Constitution as approved by the voters of the State of Oklahoma on November 6, 1990, by:

1. Providing for the granting of incentives and exemptions from taxation within certain areas, placing restrictions thereon, and limiting the time period for the exemptions, as authorized by subsection A thereof;

2. Providing for apportionment of an increment of local taxes and fees, placing restrictions thereon, and limiting the time period for the apportionment, as authorized by subsection B thereof; and

3. Providing for the planning, financing, and carrying out of development and redevelopment within certain areas, as authorized by subsection C thereof.

Nothing in the Local Development Act shall be construed in a manner contrary to or inconsistent with the provisions of said constitutional provision.

The Legislature hereby finds that historic preservation, reinvestment or enterprise areas as defined under this act are unproductive, undeveloped, underdeveloped or blighted areas pursuant to subsection C of Section 6 of Article X of the Oklahoma Constitution.

6. Okla. Const. Art. 10 § 6C:

Tax relief for historic preservation, reinvestment, or enterprise areas—Economic stagnation or decline—Use of local taxes and fees for public investments—Development or redevelopment of unproductive, etc. areas

A. The Legislature, by law, may grant incorporated cities, towns, or counties the ability to provide incentives, exemptions and other forms of relief from taxation for historic preservation, reinvestment, or enterprise areas that are exhibiting economic stagnation or decline. Relief from taxes imposed by other local taxing jurisdictions shall only be allowed by contractual arrangement with the municipal or county governing body. The law shall require public hearings before such relief may be granted and shall provide for the local initiative power and referendum of the people. The Legislature may set limitations on the cumulative incentives and relief provided pursuant to the provisions of this section, the time period for the exemptions, the geographical area of the jurisdiction covered, the percentage of the tax base of the jurisdiction eligible for the relief programs, and threshold limits of investment credit and jobs created.

B. The Legislature, by law, may authorize that the cities, towns, or counties may specifically use local taxes and local fees, in whole or in part, for specific public investments, assistance in development financing, or as a specific revenue source for other public entities in the area in which the improvements take place and may direct the apportionment of the taxes and fees specified in this subsection for the purposes specified in this section. The Legislature may establish for this subsection, the same procedures and limitations authorized in subsection A of this section.

C. The Legislature, by law, may authorize any city, town, or county to plan, finance and carry out the development or redevelopment of areas determined by the governing body of such city, town, or county to be unproductive, undeveloped, underdeveloped or blighted. The authority of the county shall be limited to the unincorporated areas of such county but any city, town or county may by agreement jointly plan, finance or carry out a development plan with any other public or private entity for one or more development projects within their respective boundaries.

D. Any city, town, or county may exercise the provisions of this section separately or in combination with powers granted by any other laws of this state.

18. Do all things necessary or convenient to carry out the powers granted in this act and otherwise authorized by the laws of this state.

62 O.S.Supp.2003 § 854(18).

The City then combines this language with a general eminent domain power found in 11 O.S.2001 § 22–104(3) & (8).

Every municipality shall have the right to:

. . .

3. Exercise the right of eminent domain for any municipal purpose, within or without its corporate limits, and to establish, lay, and operate any plant or pipeline upon any land or right-of-way taken pursuant to eminent domain. Any business or profession which is affected by the right of eminent domain as exercised pursuant to the provisions of this section shall be considered as a property right of the owner thereof and proper allowance therefor shall be made; . . .

8. Exercise powers necessary to carry out the purpose of the Local Development Act as set forth in Section 854 of Title 62 of the Oklahoma Statutes.

11 O.S. § 22–104(3) & (8).

The City argues that it has a general power to condemn property for a public purpose, in this case economic development and blight removal, and that this general power is not limited unless a City decides to follow a particular redevelopment statutory scheme that limits the exercise of the City's general condemnation power.

¶ 19 The power of eminent domain lies dormant within the State "until such time as the Legislature by specific enactment de-lineates the manner and through whom it may be exercised." *City of Tahlequah v. Lake Region Elec., Co-op., Inc.,* 2002 OK 2, ¶ 7, 47 P.3d 467, 471. The Legislature, and not a municipality, "by specific enactment designates the occasion, modes, and agencies by which it [the eminent domain power] may be placed in operation." *City of Pryor Creek v. Public Service Co. of Oklahoma,* 1975 OK 81, 536 P.2d 343, 345–346, (explanation added). A municipality may not exercise a power of eminent domain in the absence of statutory authority. *Id.*

¶ 20 The Local Development Act does not expressly give authority to exercise eminent domain. A project may be created pursuant to the Local Development Act without the exercise of eminent domain by any entity. Eminent domain is not necessary to carry out those powers expressly conferred by § 854 of the Local Development Act. We also conclude that a municipality exercising power pursuant to § 22–104(8) is not given an implied eminent domain power. The Legislature has tied the power of eminent domain for an economic public purpose to removal of blight when municipalities and public trusts jointly create such projects, and a municipality is not possessed with an unfettered discretion to condemn property for economic redevelopment projects outside of the scope of statutory schemes that the Legislature has provided for removal of blighted property. These conclusions are supported by how the Legislature has designed statutes for economic redevelopment and blight removal.

¶ 21 Our State Constitution sets limits on the State's exercise of its eminent domain power.[7] Private property may not

---

7. Okla. Const. Art. 2 § 23:

No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.

Okla. Const. Art. 2 § 24:

Private property shall not be taken or damaged for public use without just compensation. Just compensation shall mean the value of the property taken, and in addition, any injury to any part of the property not taken. Any special and direct benefits to the part of the property not taken may

be offset only against any injury to the property not taken. Such compensation shall be ascertained by a board of commissioners of not less than three freeholders, in such manner as may be prescribed by law. Provided however, in no case shall the owner be required to make any payments should the benefits be judged to exceed damages. The commissioners shall not be appointed by any judge or court without reasonable notice having been served upon all parties in interest. The commissioners shall be selected from the regular jury list of names prepared and made as the Legislature shall provide. Any party aggrieved shall have the right of appeal, without bond, and trial by jury in a court of record. Until the compensation shall be paid to the own-

be taken or damaged by the condemning agency unless the taking or damage is necessary for the accomplishment of a lawful public purpose. *Luccock v. City of Norman,* 1978 OK 66, 578 P.2d 1204, 1206, *citing,* Okla. Const. Art. 2 §§ 23, 24. Whether the property is taken for a public purpose presents a judicial question. *Public Service Co. of Oklahoma v. B. Willis, C.P.A., Inc.,* 1997 OK 78, ¶ 19, 941 P.2d 995, 1000.

¶ 22 The cases before us involve a municipality using eminent domain for the purpose of economic redevelopment and blight removal in a joint project with a public trust. Many redevelopment statutes use condemnation to economically redevelop areas that have become blighted. These statutes frequently authorize private use of the property after the blighted conditions are removed. For example, one author has explained:

Urban redevelopment statutes were upheld almost unanimously even though following clearance, redevelopment sites were usually sold to private redevelopers. The courts declared that resale for private use was "incidental" to the main justification for these laws: "blight" removal. Removing blight was, constitutionally, a sufficient public purpose.

12 *Thompson on Real Property,* § 98.02(d), (David A. Thomas ed., 1994), (Supp.2003), (note omitted).

In *Isaacs v. City of Oklahoma City,* 1966 OK 267, 437 P.2d 229, *cert. denied,* 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967), this Court upheld the constitutionality of urban renewal

laws that allowed post-condemnation use of the property by private interests. We said:

Without exception, redevelopment programs have been upheld against this type of objection, *usually on the grounds that the public use or public purpose is legitimately served by the legislative object of slum or blighted area clearance,* and the fact that private interests benefit incidentally or that private parties acquire ownership *after the public purpose of the elimination of the undesirable conditions has been served,* is merely incidental to the main legislative purpose.

*Isaacs v. City of Oklahoma City,* 437 P.2d at 234, emphasis added.

Both *Thompson* and *Isaacs* make a distinction between removal of blight and economic redevelopment. The former is the public purpose that constitutionally justifies the subsequent sale of the property for private use. Midwest City's efforts at redevelopment are best understood in the context of how the Legislature has linked the removal of blight with economic development.

¶ 23 In 1959 the Legislature created two urban renewal Acts, and a third in 1961.[8] *Isaacs,* 437 P.2d at 235. All three statutory schemes provided for the creation of a municipal Urban Renewal Authority after a corresponding local governing body adopted a resolution as statutorily specified. 11 O.S.Supp.1959 §§ 1607, 1609(a), 1657(a).[9] All three statutory schemes expressly provided for an Urban Renewal Authority exercising a

er, or into court for the owner, the property shall not be disturbed, or the proprietary rights of the owner divested. When possession is taken of property condemned for any public use, the owner shall be entitled to the immediate receipt of the compensation awarded, without prejudice to the right of either party to prosecute further proceedings for the judicial determination of the sufficiency or insufficiency of such compensation. The fee of land taken by common carriers for right of way, without the consent of the owner, shall remain in such owner subject only to the use for which it is taken. In all cases of condemnation of private property for public or private use, the determination of the character of the use shall be a judicial question.

8.   11 O.S.Supp.1959 §§ 1601–1620 (Urban Redevelopment Law); 11 O.S.Supp.1959 §§ 1651–

1670 (Urban Redevelopment Act); 11 O.S.1961 §§ 1701–1718 (Urban Redevelopment Act of 1961).

9.   Sections 1609(a) and 1659(a) are identical and provided in part: "There is hereby created in each incorporated city to which this Act is applicable, a public body corporate to be known as the 'Urban Renewal Authority'...."

Sections 1607, 1657 required a resolution by the local governing body determining that an Urban Renewal Authority should exercise its power, that a blighted area existed, and that redevelopment of the area was necessary.

In cities with a population of 10,000 or less a vote of the people was required prior to an urban renewal authority exercising its statutory powers.11 O.S.1961 § 1707.

power of eminent domain.[10] All three statutory schemes used similar definitions for a "blighted area." [11] These three statutory schemes were combined, with some modifications, and codified into our present Article 38 of Title 11 "Urban Renewal" which, except as otherwise provided therein, applies to all municipalities in this state. 11 O.S.2001 § 38–101.

¶ 24 The current urban renewal statutes provide that a municipality formulates a program "to eliminate and prevent the development or spread of blight, to encourage needed rehabilitation, and to provide for the redevelopment of blighted areas. . . ." 11 O.S. 2001 § 38–103. An urban renewal authority may exercise the power of eminent domain. 11 O.S.2001 § 38–111(A). An Urban Renewal Authority possesses authority to make relocation payments "for moving expenses and losses of property" to persons, families, or businesses displaced by an urban renewal project. 11 O.S.2001 § 38–108(A)(8). See also 63 O.S.2001 §§ 1092.1–1099 (Oklahoma Relocation Assistance Act). In sum, a municipality may achieve urban renewal through the mechanism of an Urban Renewal Authority.

¶ 25 In 1981 the Legislature created the Central Business District Redevelopment Act. 11 O.S.1981 § 40–101. The Act's purpose was to "promote, stimulate and develop the general and economic welfare of this state and its communities and to assist in the development and redevelopment of central business district areas of cities, . . . " 11 O.S. 1981 § 40–102. The Act gave municipalities the authority to create a redevelopment plan (11 O.S.1981 § 40–104), and a municipality, "upon a two-thirds (2/3) vote of the members of the governing body, shall have the right to acquire by condemnation any interest in real property, . . . [and] [a]ny such city may exercise the power of eminent domain." 11 O.S. 1981 § 40–105(A), (material added). As an alternative to a municipality developing and executing a redevelopment plan, the Central Business District Redevelopment Act provided that a public trust could be organized "for the purpose of redevelopment of blighted areas." 11 O.S.1981 § 40–112. A public trust organized for this purpose was given the authority of eminent domain.11 O.S.1981 § 40–115.

¶ 26 In 1998 the Legislature amended the Central Business District Redevelopment Act and renamed it the Neighborhood Redevelopment Act. 11 O.S.Supp.1998 § 40–101. Several changes were made in the Act. For example, the former Act declared its purpose to include: "promoting the general welfare of the citizens of this state, *by authorizing cities to acquire certain property* and to issue special obligation bonds for the financing of redevelopment projects." 11 O.S.1991 § 40–102, (emphasis added). This language was amended to: "promoting the general welfare of the citizens of this state, *by authorizing cities and towns to establish redevelopment trust authorities,* and to authorize such authorities to undertake redevelopment activities within such neighborhoods." 11 O.S.Supp.1998 § 11–40–102, (emphasis added).

¶ 27 The statute that formerly provided a municipality with an express power of eminent domain for the purpose of the Act, 11 O.S.1991 § 40–105, was repealed as part of the 1998 amendments. The 1998 amendments expanded the scope of the Act from central business districts to other areas in municipalities and towns. However, the Act no longer provided the alternative of authorizing either a municipality or a public trust to execute the provisions of the Act. The Neighborhood Redevelopment Act requires a municipality to work with a public trust "which will undertake the redevelopment activities on behalf of such city or town." 11 O.S.Supp.1998 § 40–104. In sum, the Neighborhood Redevelopment Act requires a municipality to achieve the economic redevelopment through a redevelopment trust authority.

¶ 28 The Urban Renewal Act, Neighborhood Redevelopment Act, and Local Development Act contain definitions of blight. The Urban Renewal Act's definition of "blighted

---

10. 11 O.S.Supp.1959 §§ 1613, 1663, and 11 O.S. 1961 § 1712.

11. 11 O.S.Supp.1959 §§ 1603(g), 1653(g); 11 O.S.1961 § 1703(g).

area" is broad for the purposes of urban renewal, and may be based upon *one or several* factors that (1) substantially impair or arrest the sound growth of a municipality or (2) constitute an economic or social liability or (3) endangers life or property by fire or other causes or (4) are conducive to ill health, transmission of disease, mortality, juvenile delinquency, or to crime and by reason thereof, is detrimental to the public health, safety, morals or welfare. 11 O.S.2001 § 38–101(8).[12]

¶ 29 Although the presence of blight may be based upon the presence of a single factor when applying the Urban Renewal Act, the Neighborhood Redevelopment Act requires the presence of *a majority of ten factors*.

The following terms, whenever used or referred to in this act, shall, unless a different intent clearly appears from the context, be constructed to have the following meaning:

1. "Blighted conditions" means conditions which, *because of the presence of a majority of the following factors*, substantially impair or arrest the sound development and growth of the municipality or constitute an economic or social liability or are a menace to the public health, safety, morals or welfare in its present condition and use:

a. a substantial number of deteriorated or deteriorating structures,

b. predominance of defective or inadequate street layout,

c. unsanitary or unsafe conditions,

d. deterioration of site improvements,

e. absentee ownership,

f. tax or special assessment delinquency exceeding the fair value of the land,

g. defective or unusual conditions of title,

h. improper subdivision or obsolete platting or land uses,

i. the existence of conditions which endanger life or property by fire and other causes, or

j. conditions which create economic obsolescence, or areas containing obsolete, non-functioning or inappropriately developed structures;

11 O.S.2001 § 40–113(1), (emphasis added).

¶ 30 The Local Development Act's definition for blight occurs in the context of a definition for a "reinvestment area," and the Act provides that an area may become blighted by *one or more* of certain factors. The definition of a blighted area in the Local Development Act also incorporates the definition for a blighted area that is used in the Urban Renewal Act.

17. "Reinvestment area" means any area located within the limits of a city, town or county requiring public improvements, including but not limited to transportation-related projects identified by any transportation authority pursuant to Section 1370.7 of Title 68 of the Oklahoma Statutes, to reverse economic stagnation or decline, to serve as a catalyst for retaining or expanding employment, to attract major investment in the area or to preserve or enhance the tax base or in which fifty percent (50%) or more of the structures in the area have an age of thirty-five (35) years or more. Such an area is detrimental to the public health, safety, morals or welfare. *Such an area may become a*

12. 11 O.S.2001 § 38–101(8):

8. "Blighted area" shall mean an area in which there are properties, buildings, or improvements, whether occupied or vacant, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation or open spaces; population overcrowding; improper subdivision or obsolete platting of land, inadequate parcel size; arrested economic development; improper street layout in terms of existing or projected traffic needs, traffic congestion or lack of parking or terminal facilities needed for existing or proposed land uses in the area, predominance of defective or

inadequate street layouts; faulty lot layout in relation to size, adequacy, accessibility or usefulness; insanitary or unsafe conditions, deterioration of site or other improvements; diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land; defective or unusual conditions of title; any one or combination of such conditions which substantially impair or arrest the sound growth of municipalities, or constitutes an economic or social liability, or which endangers life or property by fire or other causes, or is conducive to ill health, transmission of disease, mortality, juvenile delinquency, or crime and by reason thereof, is detrimental to the public health, safety, morals or welfare;

*blighted area because of any one or more of the following factors:* dilapidation; obsolescence; deterioration; illegal use of individual structures; presence of structures below minimum code standards; abandonment; excessive vacancies; overcrowding of structures and community facilities; lack of ventilation, light or sanitary facilities; inadequate utilities; excessive land coverage; deleterious land use or layout; depreciation of physical maintenance; and lack of community planning. *Such an area includes a blighted area as defined in Section 38–101 of Title 11 of the Oklahoma Statutes* at the time of approval of the project plan; and

62 O.S.Supp.2003 § 853(17), (emphasis added).

Although the definition of a "blighted area" in § 853 "includes a blighted area as defined . . . [by the Urban Renewal Act]," § 853 does not require applying the Urban Renewal definition in order for an area to be blighted for the purpose of the Local Development Act.

▪ ¶ 31 The definition of a "blighted area" in the Local Development Act is broader, and more easily applied by a municipality than the definitions in either the Urban Renewal or Neighborhood Redevelopment Acts. The Neighborhood Redevelopment Act requires the presence of a majority of ten factors. The Urban Renewal Act requires that the factors used to show the presence of a blighted area have at least one of four effects on the municipality: substantial impairment of growth, economic or social liability, danger to life or property, or detrimental conduciveness to disease or social disorder. 11 O.S.2001 § 38–101(8). Such predicates are not required by the Local Development Act.

¶ 32 Both the Urban Renewal Act and the Neighborhood Redevelopment Act provide certain benefits to landowners that the Local Development Act does not provide. For example, an urban renewal plan may be adopted by a municipal governing body if it finds that "[a] feasible method exists for the

relocation of families and businesses who will be displaced from the urban renewal area in decent, safe and sanitary accommodations within their means and without undue hardship to such families and businesses . . . ." 11 O.S.2001 § 38–106(E). The Urban Renewal and Neighborhood Redevelopment Acts provide for payments to displaced families and businesses in the form of relocation assistance. 11 O.S.2001 § 38–108(8) and § 40–109.[13]

¶ 33 The City of Midwest City argues for being allowed to use the least restrictive definition for a "blighted area" when condemning private property without an express grant of that authority, although the Legislature has imposed more restrictive definitions for blight when express statutory authority for eminent domain is granted to a municipality and a public trust implementing an economic redevelopment plan. The absence of a grant of authority to condemn property in the Local Development Act is consistent with that Act's absence of protections for landowners.

¶ 34 The Legislature has expressed a public policy to provide certain benefits to landowners when their property is taken for economic development by the concerted effort of municipalities and their public trusts. The City of Midwest City has failed to point to any public policy that would support its argument that the Legislature did not want to provide such benefits when a municipality is the sole named party seeking to condemn property for economic development engaged in by a municipality and an associated public trust.

¶ 35 The City of Midwest City states that the property for its project is blighted for purposes of the Local Development Act. The City's made this determination using, with one exception, language from the Local Development Act. The City of Midwest City passed ordinance No. 2002–11 on May 28, 2002, and stated therein:

WHEREAS, the members of the City Council have personal knowledge of the conditions prevailing in the Project Area,

---

13. The three statutory schemes in effect in 1961 provided for relocation assistance to those required to relocate their homes and businesses. 11 O.S.1961 §§ 1610(h), 1660(h), 1710(h). The

Central Business District Redevelopment Act also provided for relocation assistance. 11 O.S.1981 § 40–109.

and find the following conditions existed as of January 1, 1999, prior to the Economic Development Resolutions, and continue to the present:

1. the Project Area has been underdeveloped for many years; and

2. the Project Area requires public improvements to reverse economic stagnation or decline, to serve as a catalyst for retaining or expanding employment, to attract major investment in the area and enhance the tax base; and

3. fifty percent (50%) or more of the structures in the Project Area have an age of thirty-five (35) years or more; and

4. the Project Area is and was a blighted area because of each and a combination of the following factors: dilapidation, obsolescence, deterioration, presence of structures below minimum code standards, abandonment, excessive vacancies, arrested economic development, deleterious land use or layout, depreciation of physical maintenance and lack of community planning; and

5. the Project Area is and was a reinvestment area under the terms of Section 853 of Title 62 of the Oklahoma Statutes and is and was unproductive, underdeveloped and blighted under Article 10, Section 6C of the Oklahoma Constitution; and

6. pursuant to Oklahoma statutes, the Project Area is and was detrimental to the public health, safety or welfare; . . . .

Paragraph number 4 above refers to "arrested economic development" of the Project Area. This language is not listed as a factor in § 853, but is one that may be used to show blight for the purposes of the Urban Renewal Act. 11 O.S.2001 § 38–101(8).

¶ 36 The City determined that the Project Area was detrimental to the public health, safety or welfare, and blighted, and therefore subject to an exercise of a general eminent domain power by the City to effectuate economic development. Landowners challenge this conclusion. They agree that the Local Development Act provides a definition for a blighted area. However, they argue that, unlike the Urban Renewal and Neighborhood Redevelopment Acts, the Local Development Act fails to provide guidelines or limits on a municipality's exercise of discretion when exercising an eminent domain power for the purpose of economic redevelopment. They argue that the absence of such limits or guidelines makes unconstitutional the exercise of a general eminent domain power for the purpose of economic redevelopment. We need not address this challenge by the Landowners.

¶ 37 A municipality, the City of Midwest City, and a public trust, the Midwest City Memorial Hospital Authority, have a joint project to remove blighted property and establish economic redevelopment. The municipality and public trust did not follow those statutes that the Legislature has provided for circumstances when a municipality and a public trust jointly remove blighted property and establish economic redevelopment. The City argues that it followed the Local Development Act. We need not decide, for the purpose of these appeals, whether the City complied with that Act, for that Act contains no express, or necessarily implied, grant of an eminent domain power to a municipality.

¶ 38 We reverse the orders of the District Court herein because the City did not possess authority pursuant to its general eminent domain powers to condemn the property apart from those statutes regulating the joint conduct [14] of municipalities and public trusts when removing blighted property and creating economic redevelopment. The orders of the District Court are reversed.

¶ 39 ALL JUSTICES CONCUR.

---

14. We do *not* have before us a project that is created, funded, and operated *solely* by a municipality. We decline to address the power of a municipality in that hypothetical circumstance.

*Tulsa County Budget Bd. v. Tulsa County Excise Bd.*, 2003 OK 103, 81 P.3d 662, 672 (the Court does not issue advisory opinions or answer hypothetical questions).