2004 OK 97

HOUSE OF REALTY, INC.; Robert J. Barton, Individually and as Trustee of the Robert J. Barton Revocable Trust and successor Trustee of the of the Shirley A. "Goetsch" Barton Revocable Trust; and Pamela Barton–Stober, for themselves and for all other citizens, residents and taxpayers of the City of Midwest City, Plaintiffs/Appellants,

v.

CITY OF MIDWEST CITY, a municipality of the State of Oklahoma; Midwest City Memorial Hospital Authority, a public trust of the State of Oklahoma, Defendants/Appellees.

No. 99,422.

Supreme Court of Oklahoma.

Dec. 21, 2004.

See also 200 P.3d 678.

Terry Guy Shipley, Norman, OK, for Plaintiffs/Appellants.

Joseph H. Bocock, Stephanie L. Reaugh, Mary Ellen Ternes, McAfee & Taft, Oklahoma City, OK, for Defendants/Appellees.

EDMONDSON, J.

¶ 1 The City of Midwest City has an economic development project and it wants to include the Landowners' property as part of the project. The City brought eminent domain proceedings in the District Court resulting in two appeals that were decided by our recent opinion in *City of Midwest City v. House of Realty, Inc.*, 2004 OK 56, 100 P.3d 678.[1] The eminent domain proceedings are not part of the appeal before us.

¶ 2 This appeal is from a judgment in a proceeding brought by the Landowners where they sought injunctive and declaratory relief against the City and the Midwest City Hospital Authority (Hospital Authority).

Landowners sought an injunction to stop the eminent domain proceedings and declaratory relief on issues involving the Hospital Authority. The Hospital Authority, a public trust, is the source of funds for the economic development project.

¶ 3 Both sides to this dispute sought a summary judgment based upon the same three issues. The trial court determined that two of the three could be decided on summary judgment, and left the third for adjudication by a non-jury trial. The trial court's order states the following:

> The City has the right to condemn Plaintiffs' property to carry out the project plan adopted and authorized pursuant to Okla. Stat. tit. 11, § 22-104(3), (8) and Okla. Stat. tit. 62, §§ 854, 869. The Authority is not prohibited by Okla. Stat. tit. 60, § 178.4 from leasing the land to private developers as authorized by Okla. Stat. tit. 62, § 854(14) for redevelopment as provided in the project plan.

The third issue was Landowners' assertion that without a vote of the people the Authority was not authorized to disburse a portion of the Trust's compounded principal to implement a redevelopment project. The trial court ruled against Landowners on this claim as well.

¶ 4 Landowners appealed and argued that the trial court was incorrect on each of the three issues. After this Court issued its opinion in *City of Midwest City v. House of Realty, Inc.*, 2004 OK 56, 100 P.3d 678, both sides to this dispute filed supplemental materials and agreed that the trial court was incorrect, and that the City does not possess the authority to take Landowners' property to carry out the project plan pursuant to 11 O.S.2001 § 22-104(3), (8) and 62 O.S.2001 §§ 854, 869. However, they disagree on the application of that holding to this appeal.

¶ 5 The City and Hospital Authority argue two of three issues on appeal are moot, and Landowners disagree.[2] The City argues

---

1. An appellate court can take judicial notice of its own records in litigation interconnected with an appeal before it. *Myers v. Lashley*, 2002 OK 14, n. 8, 44 P.3d 553; *Matter of C.A.D.*, 1992 OK 89, n. 10, 839 P.2d 165, 169.

2. The term "mootness" describes an issue that was tendered for adjudication and has become abstract and hypothetical, and no longer part of a lively case or controversy between antagonistic

for mootness because 1. the former opinion decided one of the issues herein and 2. an urban renewal authority, instead of the City, is the entity now seeking to condemn Landowners' property. Landowners object on both procedural and substantive grounds to the City's suggestion of mootness.

¶ 6 Generally, this Court's appellate review is limited to those facts appearing of record certified by the clerk of the tribunal below. *S.W. v. Duncan,* 2001 OK 39, n. 14, 24 P.3d 846, 855. Exceptions to this rule include an admission of fact made in a brief and facts occurring during the pendency of an appeal that adversely affect a court's capacity to administer effective relief, such as when a controversy has become moot during an appeal. *Halliburton Oil Producing Co. v. Grothaus,* 1998 OK 110, n. 14, 981 P.2d 1244 (supplement to appellate record by admission of fact); *Lawrence v. Cleveland County Home Loan Authority,* 1981 OK 28, 626 P.2d 314, 315 (affidavit may be used to show mootness); Okla.Sup.Ct.R. 1.6(a) (facts not of record in support of a motion are shown by affidavit).

¶ 7 Landowners' response to the City's application includes an affidavit, but the facts raised by Landowners do not involve the three issues on appeal in this case. For example, Landowners argue that the proposed taking of their property by the Midwest City Urban Renewal Authority is improper. The propriety of acts taken by the Midwest City Urban Renewal Authority is not a part of this appeal. Although the City does not use an affidavit for its suggestion of mootness, Landowners do not challenge the truth of those facts raised by the City that relate to the issues on appeal, and those facts may be deemed to be admitted for the purpose of showing mootness. Our review of the post-appeal facts raised by the City leads us to conclude that one of three

issues presented on appeal is moot. We conclude that the second issue is not moot in part, and that part of the issue should be addressed by the trial court on remand. We conclude that the third issue is not moot.

## I. First Issue on Appeal

¶ 8 The first issue involves whether the City may use a general power of eminent domain combined with the Local Development Act, 62 O.S.2001 § 850, et seq. to take the Landowners' property. The parties agree that this issue was settled in *City of Midwest City v. House of Realty, Inc., supra.* The City and Hospital Authority state that this opinion makes the issue moot.

¶ 9 An opinion in one appeal that settles an issue raised in a second pending appeal does not make the latter moot. The opinion in the first appeal is *controlling* as to the latter appeal. See, for example, *Rogers v. Excise Bd. of Greer County,* 1984 OK 95, 701 P.2d 754, 758–759, where the Court stated that *Summmey v. Tisdale,* 1982 OK 133, 658 P.2d 464, an opinion decided while the *Rogers* was pending, was controlling on an issue in *Rogers.*[3] We did not dismiss as moot the appeal in *Rogers,* but rather, we applied the controlling precedent and adjudicated the assigned error on appeal. The presence of controlling decisional precedent does not, by itself, make an issue moot.

¶ 10 What makes the first issue moot is the City's post-appeal conduct in response to our opinion in *City of Midwest City v. House of Realty, Inc., supra.* The City admits that pursuant to *City of Midwest City* the trial court decided the first issue incorrectly. The City states that it has abandoned its efforts to take the property by eminent domain. The City states that the Midwest City Urban Renewal Authority, and not the City, is the entity now seeking to obtain Landowners'

demands. *Lawrence v. Cleveland County Home Loan Authority,* 1981 OK 28, 626 P.2d 314, 315.

**3.** No party to this proceeding argues whether *City of Midwest City v. House of Realty, Inc.,* 2004 OK 56, 100 P.3d 678, established a new rule of law or the application/non-application of the pipeline doctrine. *See, e.g., City of Oklahoma City v. State ex rel. Oklahoma Dept. of Labor,* 1995 OK 107, n. 1, 918 P.2d 26, 32, (Supplemen-

tal Opinion on Rehearing), (listing opinions that apply a new rule of law to cases in the litigation pipeline), *Strelecki v. Oklahoma Tax Commission,* 1993 OK 122, 872 P.2d 910, 913–916, (retroactivity of judicial decisions and pipeline doctrine discussed). We thus need not address further our jurisprudence on application of recent opinions to pending appeals.

property. The Midwest City Urban Renewal Authority is not a party to this appeal.

¶ 11 Landowners sought both injunctive and declaratory relief relating to the City's exercise of eminent domain. In *Sharp v. 251st Street Landfill, Inc.*, 1996 OK 109, 925 P.2d 546, we said that:

> Entitlement to injunctive relief must be established in the trial court by clear and convincing evidence and the nature of the complained of injury must not be nominal, theoretical or speculative ... There must be a reasonable probability that the injury sought to be prevented will be done if no injunction is issued—a mere fear or apprehension of injury will not be sufficient.

*Sharp*, 1996 OK 109, 925 P.2d at 549, (citations omitted).

The argument is made that no act of the City is involved in an eminent domain proceeding, valid or not, and thus whether the City would continue to take Landowners' property by eminent domain is merely speculative. Of course, a person's rights adversely affected by a threatened enforcement of invalid conduct by a public official will support a request for both declaratory and injunctive relief. *Southwestern Bell Telephone Co. v. Oklahoma Corporation Commission*, 1994 OK 142, n. 2, 897 P.2d 1116, 1118. But, threatened enforcement of the City's eminent domain power is no longer occurring. Mootness may arise from a post-appeal development that adversely affects the court's capacity to administer effective relief. *Lawrence v. Cleveland County Home Loan Authority*, 1981 OK 28, 626 P.2d 314, 315. Plaintiffs requesting an injunction must show that the acts against which they ask protection are not only threatened, but will, in probability, be committed to their injury. *Hodgins v. Hodgins*, 1909 OK 101, 103 P. 711, 713.[4] The

City's decision for the *City* to no longer attempt to exercise its eminent domain power adversely affects the court's capacity to administer effective injunctive relief.[5]

¶ 12 We have stated that declaratory relief is based upon the existence of a justiciable controversy. *City of Oklahoma City v. Oklahoma City Urban Renewal Authority*, 1999 OK 71, ¶ 28, 988 P.2d 901, 907; *Ethics Commission v. Cullison*, 1993 OK 37, 850 P.2d 1069, 1073. The term "justiciable" refers to a lively case or controversy between antagonistic demands. *Lawrence v. Cleveland County Home Loan Authority*, 1981 OK 28, 626 P.2d 314, 315. When a party presents antagonistic demands that are merely speculative a prohibited advisory opinion is being requested. *State ex rel. Oklahoma Capitol Imp. Authority v. E.A. Cowen Const. Co.*, 1974 OK 4, 518 P.2d 1264, 1266; *Post Oak Oil Co. v. Stack & Barnes, P.C.*, 1996 OK 23, 913 P.2d 1311, 1314. The City's argument is that it is not seeking to use eminent domain, and it will not attempt to do so in the future with regard to similar circumstances. In other words, an allegation by Landowners that the City would attempt such acts prohibited by *Midwest City v. House of Realty, Inc.*, *supra*, is merely speculative.

¶ 13 We said in *City of Midwest City v. House of Realty, Inc.*, *supra*, that the City could not use a general power of eminent domain combined with the Local Development Act, 62 O.S.2001 § 850, et seq. to take the Landowners' property. The City is no longer attempting to do this. This issue is moot.[6]

## II. Second Issue on Appeal

¶ 14 The second issue is whether the Hospital Authority is prohibited by 60 O.S.2001

4. Sometimes this probability is explained in terms of a probability of injury if an injunction is not issued. *See, e.g., Sharp v. 251st Street Landfill, Inc.*, 1996 OK 109, 925 P.2d 546, 549 ("There must be a reasonable probability that the injury sought to be prevented will be done if no injunction is issued-a mere fear or apprehension of injury will not be sufficient.")

5. We need not determine in this appeal to what extent the "speculative nature" of an act for the purpose of denying injunctive relief is the same

for an analysis of justiciability and prohibited advisory opinions.

6. What makes this issue moot is that a party to this proceeding, the City, has stopped certain conduct, and will not engage in that conduct in the future. The fact that a non-party to this proceeding, an urban renewal authority, is now engaged in similar conduct does not present an issue for this Court to decide in this appeal.

§ 178.4 from using its funds to participate in the development of retail outlets. The Hospital Authority is continuing to use its funds for the project. The Hospital Authority states that the issue is moot because the Authority is now using an urban development plan and that § 178.4 does not apply because of 60 O.S.2001 § 178.6. The trial court determined that § 178.4 did not bar the Hospital Authority's participation in the project, but the parties did not raise § 178.6 in the trial court

¶ 15 The parties disagree on an interpretation of 60 O.S.2001 § 178.4. That statute states:

§ 178.4. Trust purpose—Exceptions

A. Trusts created under the provisions of Sections 176 through 180.55 of this title or any amendments or extensions thereof shall not include any trust purpose, function nor activity: in any wholesale outlet, unless said wholesale outlet is a direct part of the industry. Provided, however, that the distribution centers for intoxicating beverages and low-point beer as defined in Title 37 of the Oklahoma Statutes shall not qualify under the provisions of this title; nor shall it include a retail outlet unless said retail outlet is operated in conjunction with and on the same premises as the industrial, manufacturing, cultural, recreational, parking, transportation or airport facility or international trade processing center; nor shall it include a residential enterprise or function except as provided in Section 178.6 of this title.

B. Nothing in this section shall preclude the financing, construction, ownership or leasing of a warehouse as a permissible trust purpose, function or activity, so long as such warehouse is not used directly or indirectly for housing, storage or distribution of intoxicating beverages or low-point beer.

60 O.S.Supp.2003 § 178.4

The parties do not dispute that the Hospital Authority is a trust created under the provisions of sections 176 through 180.55 of Title 60, commonly referred to as Oklahoma's "public trust act". *Morrison v. Ardmore*

*Indus. Development Corp.*, 1968 OK 116, 444 P.2d 816, 819; Oklahoma Attorney General Opinion, 1985 OK AG 129, ¶ 1 (O.S.C.N.).

¶ 16 Landowners argue that the Hospital Authority's participation in the development project violates § 178.4 because the project includes retail outlets. The City and Authority agree that retail outlets will be included, and further state that virtually all redevelopments will necessarily include some form of retail outlet. The City and Authority maintain that § 178.4 is not violated.

¶ 17 The Hospital Authority provides funds to acquire the property in the project area. Landowners' property has been the object of two eminent domain proceedings by the City. According to the City, the Midwest City Urban Renewal Authority is now attempting to take the property by eminent domain. After the property is taken by eminent domain its title is to be transferred to the Hospital Authority.

¶ 18 The Hospital Authority states that it is "merely 'disposing of' property by a fifty (50) year lease and a thirty (30) year renewal option to a private redeveloper in an arm's length business transaction, and receiving a return for that disposition." The Hospital Authority argues that § 178.4 will not be violated unless the developer defaults on its obligations: "The Authority acknowledges that if Sooner [the developer] should default on the lease and the retail improvements become the property of the Authority, the Authority would be under an obligation to promptly dispose of the property under Section 178.4." (Explanation added). The Hospital Authority argues that this "unlikely contingency" must not defeat the purpose of the Local Development Act.

¶ 19 This Court has adjudicated controversies involving public trusts, but has not had an occasion to examine § 178.4 in the context of a public trust financing a project for obtaining land to be used for retail facilities. The Attorney General of the State of Oklahoma has discussed § 178.4 at least five times. The three most recent warrant comment.[7] In 1982 the Attorney General issued

---

7. The two other opinions are: 1978 OK AG 309

(10 Okl. Op. Atty. Gen. 682), (A public trust, the

an Opinion stating that a public trust could not finance the construction of a motel and restaurant unless they are operated on the same premises with and in conjunction with the industrial trust facility. 1982 OK AG 81 (14 Okl. Op. Atty. Gen. 189). He explained that § 178.4 is a "plain prohibition" to a public trust financing a retail outlet. 1982 OK AG 81 ¶ 2 (O.S.C.N.). He then explained the exception to the prohibition in § 178.4 where a public trust could finance certain types of retail activities: "The obvious reason for the exception in § 178.4 to which your question alludes is not to foreclose industrial, manufacturing, cultural, recreational, parking, transportation or airport projects from trust financing merely because one or more retail outlets will be operated incidentally from the same premises, such as a gift shop at an airport." 1982 OK AG 81 ¶ 6 (O.S.C.N.).

¶ 20 In 1985 the Attorney General stated that a public trust could not use its funds to acquire, construct or equip a livestock auction market unless it was on the same premises with, and operated in conjunction with, an industrial, manufacturing, cultural, recreational, parking or transportation or airport facility. 1985 OK AG 129 (17 Okl. Op. Atty. Gen. 208). This Opinion is consistent with the 1982 Opinion.

¶ 21 In 1979 the Attorney General determined that a public trust, the Mid–America Industrial Park, could not construct and lease a warehouse to store goods used by retail business. 1979 OK AG 215, (11 Okl. Op. Atty. Gen. 342). In 1990 the Legislature amended § 178.4 to allow a public trust to finance, construct, own or lease a warehouse as a permissible public trust purpose. 1990 Okla.Sess.Laws, Ch. 72, § 1. In 1990 the Legislature did not alter § 178.4 with regard to the Attorney General's conclusions made in the 1982 and 1985 opinions.

■ ¶ 22 We have said that an Opinion of the Attorney General construing a statute has persuasive authority and silence by the Legislature may be regarded as acquiescence or approval of that construction by the Attorney General. *National Cowboy Hall of Fame and Western Heritage Center v. State ex rel. Oklahoma Human Rights Commission,* 1978 OK 76, 579 P.2d 1276, 1279; *Goble v. Mazie Dependent School Dist. D–32,* 1971 OK 105, 488 P.2d 156, 157. We agree with the Attorney General that § 178.4 contains a broad prohibition on public trusts engaging in financing, constructing, and operating retail outlets. We also agree that § 178.4 has an exception and allows retail activities such as a gift store in an airport.

■ ¶ 23 The City and Hospital Authority also apparently agree with the Attorney General since they state that if the developer fails to satisfy its obligations the Authority could be required to divest itself of the property because of § 178.4. However, they argue that the Authority is not in violation of § 178.4 if it transfers (leases) its property to the developer who in turn leases the property to retail outlets. This argument is not convincing.

¶ 24 The statute prohibits a trust engaging in an "activity" in a retail outlet. The Project Plan specifically includes plans for both specific anchor retail stores and unspecified retail stores. The Hospital Authority is investing in retail activities—it is buying land for the purpose of operating, albeit through a third individual, retail activities. One aspect of the Hospital Authority's investment in retail activities is shown by how the Hospital Authority will receive income from the retail project.

Q. Okay. From whom is Sooner Town leasing the land?

A. From the Midwest City Hospital Authority.

Q. What in a general way are the payment obligations of the developer to the Authority?

A. The payment obligations come in the form of three divided parts. The first part is what they call the guarantee

Cleveland County Home Loan Authority, could provide assistance to persons or families with low or moderate income by obtaining and financing housing); 1977 OK AG 133 (10 Okl. Op. Atty. Gen. 43), (A public trust may be created for the furtherance, or providing the funds for the furtherance, of any public function of the beneficiary except as prohibited by 60 O.S.Supp.1976 § 178.4 and 62 O.S.Supp.1976 § 652).

rent, which is the pass-through rent of our two main anchors, Target and Lowe's.

The second form of rent comes in what we call a preferred rent, which would be rent after expenses have been paid operating the property, and expenses of the debt that could be placed upon the development, but before the developer is to receive any money.

And then the third form of rent comes in the form of participation rent, which is an equal amount that the developer receives from the project.

Tr. at 57–58.

We find unpersuasive the argument that while, in general, a public trust would not be permitted to buy land and rent it to Target and Lowe's, this Hospital Authority should be allowed to buy land and rent it to Target and Lowe's so long as it does so through a third party. The record clearly shows that the Hospital Authority is planning to purchase land for the purpose of providing the land for retail activities by others and be compensated from those retail activities. The Hospital Authority is prohibited by § 178.4 from buying land for this Project unless some other legal authority exempts it from the reach of § 178.4.

¶ 25 The Hospital Authority states in its post-appeal supplemental materials that such authority exists, 60 O.S.2001 § 178.6. That statute states:

Public trusts—Exemption from provisions—Housing finance

The provisions of Sections 652 and 653 of Title 62 of the Oklahoma Statutes and Sections 178.4 and 178.5 of this title shall not affect: public trusts operating facilities for the aged or disabled persons by nonprofit, religious or benevolent organizations; public trusts operating county, municipal or nonprofit hospitals; public trusts operating college or educational dormitories or student housing facilities; trusts formed for the purpose of constructing buildings for local units of the Department of Human Services under the provisions of Section 189a of Title 56 of the Oklahoma Statutes; public trusts carry-ing out redevelopment, rehabilitation and conservation activities in accordance with an approved urban renewal plan, provided property owned by said trust shall not be exempt from ad valorem taxation for a period exceeding five (5) years; trusts created under the provisions of Sections 15–141 through 15–147 of Title 2 of the Oklahoma Statutes or other trusts created for the same purpose. Section 176 et seq. of this title shall not prevent public trusts from administering a housing program pursuant to a contract with an agency of the United States Government or the State of Oklahoma, or prevent public trusts from financing housing programs, provided said programs involve only property that is subject to ad valorem taxation and located within the geographic boundaries of the beneficiary or beneficiaries of the public trust or meet the requirements of clauses (i), (ii), (iii), (iv) and (v) of subdivision b of division 2 of subparagraph a of paragraph 8 of Section 2887 of Title 68 of the Oklahoma Statutes.

A public trust with a city or cities, a county or counties, or the state as the beneficiary or beneficiaries thereof may issue its evidences of indebtedness for the purpose of financing housing or housing programs within the geographic boundaries of its beneficiary or beneficiaries as same represent an authorized and proper public function for public trusts.

60 O.S.2001 § 178.6, (emphasis added).

The City and Hospital Authority state that they are now proceeding with the redevelopment plan pursuant to the Urban Renewal Act, and that this fact places their conduct outside the scope of § 178.4. This argument presents several issues which must be left for the trial court on remand.

¶ 26 The argument made by the City and Hospital is based upon the existence of an urban renewal plan. The existence of this plan is raised for the first time in post-appeal supplemental filings. The post-appeal supplemental material filed by Landowners challenges the legality of the urban renewal plan as well as the authority of the Midwest City Urban Renewal Authority in the condemnation proceedings. *Assuming, without decid-*

*ing, that § 178.6 would be applicable to the Midwest City Hospital Authority,* such application would be based, *pursuant to the City's argument,* on a legal urban renewal plan that is actually being properly implemented by the Authority. We decline the invitation by the City and Authority to make a first-instance adjudication on appeal deciding whether certain facts exist and the legality of an urban renewal plan so as to exempt the Hospital Authority from the reach of § 178.4.

¶ 27 On occasion we have remanded a proceeding to a trial court for it to make a first-instance adjudication of facts and law because of a post-appeal change in law due to an after-enacted statute. *See, e.g., American Ins. Association v. State Indus. Commission,* 1987 OK 107, 745 P.2d 737, 740–741 (trial tribunal's order was vacated and the cause remanded with directions to afford a party a full opportunity to argue based upon an after-enacted statute). The proper forum is the trial court for the arguments and development of a record relating to § 178.6. While we reverse the trial court on its legal conclusion that § 178.4 does not apply to the Midwest City Hospital Authority, the Authority and Landowners are left with a full opportunity to address the applicability of § 178.6 on remand. Further, in light of our holding on the third issue raised on appeal, additional litigation in the District Court on this second issue *may* not be required, a determination which should be adjudicated in the first instance in the trial court.

### III. Third Issue on Appeal

¶ 28 The third issue is whether a vote of the people of Midwest City is necessary to authorize the Hospital Authority to use certain funds to purchase real estate. An urban renewal authority's participation in the project, does not resolve by itself issues involving the Hospital Authority's authority to use its funds. The Hospital Authority is providing the funds for the economic development project.[8]

¶ 29 The Midwest City Hospital Authority is a Trust. The Hospital Authority owns and leases the Midwest City Hospital. A lease was created with Health Management Associates, Inc., and Midwest City HMA, Inc. (collectively HMA). HMA provided forty-six million dollars to the Hospital Authority and operates the hospital. The Amended and Restated Trust Indenture of the Hospital Authority (Trust Indenture) describes this forty-six million dollars, with income and capital gains derived therefrom, as the Compounded Principal.

¶ 30 Landowners argue that the Compounded Principal may not be used for real estate investments unless approved by a vote of the people. The City and Authority disagree. The language of the Trust Indenture describing its purpose states:

(d) To expend all funds coming into this Trust as revenue or otherwise for the payment of any indebtedness incurred by this Trust, and in payment of the aforesaid costs and expenses, and in payment of any other obligation properly chargeable against the Trust Estate, and to distribute the residue and remainder of such funds to the Beneficiary upon termination of this Trust in accordance with Article IX of this Amended Trust Indenture. The only funds of this Trust to which the previous provisions of this subparagraph shall not apply are those in the principal amount of approximately $46 million, hereinafter referred to as the "Principal," that came into this Trust as a result of the lease and/or sale of this Trust's real and personal property. **The Principal and all capital gains and all income of any nature or kind earned from the Principal shall hereinafter be referred to as the "Compounded Principal." The Compounded Principal, less and except two percent (2%) of the market value of the Compounded Principal as of June 30 each year, shall be segregated and set apart,**

---

8. The supplemental materials filed in this appeal indicate that an urban renewal authority is proceeding with the economic development project pursuant to an urban renewal plan. Although an urban renewal authority may fund its own projects, (for example, see 11 O.S.2001 § 38–115 and the power conveyed to urban renewal authorities to issue notes and bonds), the post-appeal materials also indicate that the parties plan to proceed with funding the economic development from the Midwest City Hospital Authority's funds.

and shall not be spent for any reason except in the event that (1) the lease of the real property to Health Management Associates, Inc. and Midwest city HMA, Inc. terminates prematurely prior to the end of the lease and this Trust regains the operation and control of the lease property; or (2) an affirmative vote of a majority of the electors in the city of Midwest City expressed during a public election, duly called as required by law, authorizes an expenditure of all or any portion of the Compounded Principal for a specific public or governmental purpose or purposes and authorized and proper Trust function indicated on the ballot submitted at such an election. The two percent of the market value of the Compounded Principal excluded from the Compounded Principal each year, hereinafter referred to as the "Discretionary Funds," shall be available for distribution each year as grants, for other expenditures and/or to be otherwise designated at the Trustees' sole discretion, subject to the restriction contained in this Amended Trust Indenture. The Trustees may distribute or expend all or any portion of the Discretionary Funds as the Trustees may deem prudent or make no distribution or expenditure of the Discretionary Funds at all. Undesignated Discretionary Funds shall be accumulated for use in subsequent years, provided grants from the Discretionary Funds are used for authorized and proper functions of the Beneficiary and follow the required channel of grant applications as set out in this Amended Trust Indenture;

O.R. at 489–491, Amended and Restated Trust Indenture, Art. III, paragraph (1)(d), (emphasis added).

¶ 31 This provision plainly identifies five types of funds, (1) Trust Estate (2) Principal (3) Compounded Principal, (4) Discretionary and (5) Undesignated Discretionary. The Principal is defined as forty-six million dollars. The Compounded Principal is the Principal plus capital gains and income generated from the Principal. The identification of the Compounded Principal is important for interpreting other provisions of the Trust. This is so because Compounded Principal is ex-

cluded from the "Trust Estate" managed by the Trustees.

The Trust Estate shall consist of:

(1) The funds and property, and any income therefrom, **except the Compounded Principal:**

(a) Presently owned by this Trust or to be acquired or constructed by this Trust; and

(b) Dedicated by the Trustor and others to be used for this Trust's purposes;

(2) Any and all money, property, contracts, leases, licences, franchises, benefits and all other things of value coming into possession of this Trust pursuant to the provisions of this Amended Trust Indenture; and

(3) Any and all money and leasehold rights remised to this Trust by the Beneficiary as authorized and empowered by law.

O.R. at 493, Amended and Restated Trust Indenture, Art. V., (emphasis added).

Landowners point to another provision of the Trust Indenture describing the powers of the Trustees.

(h) To do all other acts in the Trustees' judgment necessary or desirable for the proper and advantageous management, investment and distribution of the Trust Estate and the Compounded Principal and income therefrom, **subject to the limitations contained in this Amended Trust Indenture;**

O.R. at 493, Amended and Restated Trust Indenture, Art. VII paragraph (1)(h), (emphasis added).

Landowners argue that "the limitations contained in this Amended Trust Indenture" include that paragraph of the Trust Indenture limiting expenditures of the Compounded Principal.

¶ 32 The Authority relies upon two provisions of the Trust Indenture discussing the powers and duties of Trustees. According to one provision, the Trustees are authorized:

(a) To finance, acquire, establish, develop, construct, enlarge, improve, extend, maintain, equip, operate, lease, furnish, provide, supply, regulate, hold, store and administer anything in the

Trust Estate and the Compounded Principal, subject to the limitations contained in this Amended Trust Indenture, as the Trustees shall determine necessary for the benefit and development of the Beneficiary:

O.R. at 497, Amended and Restated Trust Indenture, Art. VII, paragraph (1)(a).

This first provision plainly states that the Trustees may finance, acquire, and lease property. However, this provision also plainly states that this authority to finance, acquire, and lease is subject to limitation on that authority found in the Trust Indenture. Which again raises the issue of the meaning of language in Article III limiting the Trustees authority to expend the Compounded Principal.

¶ 33 The Hospital Authority also relies upon the following provision of Article IV of the Trust Indenture, allowing Trustees:

(e) To make and change investments, to lease, improve, exchange or sell, at public or private sale, upon such terms as the Trustees deem proper, and to resell, at any time and as often as they deem advisable, **any or all the property in this Trust,** to borrow money, or renew loans to this Trust, to refund outstanding bonded indebtedness and to execute therefor evidences of indebtedness, and to secure the same by mortgage, lien pledge or otherwise; to purchase property from any person, firm or corporation, and lease land and other property to and from the Beneficiary and construct, improve, repair, extend, remodel and equip utilities or buildings, and facilities thereon, and to operate or lease or rent the same to individuals, partnerships, associations, corporations and others, including the United States of America or the State of Oklahoma and agencies or authorities of the United States of America, or of the State of Oklahoma, or any municipality thereof, and also including all municipal or other political subdivisions of the State of Oklahoma as well as the Beneficiary, and **to do all things provided for in Paragraph (1) of Article III of this Amended Trust Indenture,** and procure funds necessary for such purpose by the sale of bonds or other evidences of indebtedness by the mortgage, lien, pledge or other encumbrance of such personal property, utilities and facilities owned or otherwise acquired, leased or controlled by this Trust, and by rentals income, receipts and profits therefrom, or from any other revenues associated with the ownership, operation or control **of the property of this Trust** or of which this Trust may become the owner or lessee.

O.R. at 500–501, Amended and Restated Trust Indenture, Art. VII, paragraph (1)(e), (emphasis added).

Even if we construe the provisions referring to property in or of the Trust to be more inclusive than "Trust Estate" and thereby include Compounded Principal as property of the Trust that is an investment which may be made and changed by the Trustees, this Article VII language also refers to paragraph 1 of Article III of the Trust Indenture which contains a limitation on expending the Compound Principal. The arguments of both sides to this dispute are based upon the meaning of the language in Article III of the Trust Indenture that limits spending the Compounded Principal.

¶ 34 The Hospital Authority uses a financial advisor located in New Jersey who routinely gives financial advice to fiduciaries. The Compounded Principal started at forty-six million dollars and grew to sixty-seven million dollars. Prior to 1998 the financial advisor counseled the Hospital Authority to maintain a 60/30/10 mixture, sixty percent stocks, thirty percent bonds, ten percent other forms of liquid assets. He then counseled a change in the proportion of stocks and bonds, and also recommended altering the proportion of foreign and local investments. He suggested that real estate investments could be beneficial. The Authority decided that a portion of their investments should be in real estate, and has recently authorized thirty million dollars of its funds to be used for the economic development project.

¶ 35 A Trustee of the Authority was questioned at trial whether moving the Authority's funds to a less liquid investment such as real estate, was a source of concern. He said; "We no longer have any concerns." Tr. at 29. He stated that at one time the

Authority was concerned that a company could lease the Hospital and close it to help other hospitals in Oklahoma County that the lessee-company owned or operated. The Hospital, after a fifty year lease, will revert back to the Hospital Authority, and the Authority did not want the Hospital "diminished or stripped off" by the acts of a lessee-company operating the hospital. Tr. at 30. The Trustee stated:

> Our concern in 1996 was that somebody might try to harm the hospital, close the hospital. Our concern now is not that somebody might try and close the hospital, but do we have enough physical space around the hospital to allow for their expansion.

Tr. at 31.

His testimony also included the following:

> A .... it's not the same concern that we had in 1996 where we thought we would have to repurchase the hospital, but rather now we want to make sure that we just maintain sufficient liquid capital so that if something happened to HMA corporate, we would be able to provide operating funds for the short term until another company could come in and run the hospital.
>
> Q. In your view, what is the liquidity of this 60 million dollar trust is [sic] necessary to make sure in the event of any catastrophe the hospital can be kept open?
>
> A. The 60 million dollars is really 67 plus million dollars. The twenty-seven million is tied up in real estate and 42 million is in liquid assets. We estimate that at least 30 million dollars would be necessary to run the hospital for two, maybe three years. We do not believe that it would ever be necessary to run it that long, but we believe that only 30 million would be necessary to provide operating funds.

Tr. 31–32.

 ¶ 36 The parties discuss the meaning of the terms "spent" and "investment" with varying definitions for each. Instead of focusing on a definition that is not part of the Trust Indenture, we focus instead on the language that is part of that document, that which explains why the Compounded Principal is to be preserved. Where there is no ambiguity and the language of a trust is clear and plainly susceptible of only one construction, the plain provisions of the trust instrument must determine its construction. *Matter of Home–Stake Production Co. Deferred Compensation Trust,* 1979 OK 81, 598 P.2d 1193, 1196. The Trust Indenture states that the Compounded Principal shall not be spent for any reason except in the event that HMA prematurely terminates its lease or by a vote of the people. The Authority's position is that at one time it was of the opinion that it needed to maintain the Compounded Principal in liquid assets so that it could repurchase the hospital if HMA prematurely terminated it lease. However, it now takes the position that it need only maintain sufficient liquid assets to operate the hospital for two to three years should HMA prematurely terminate its lease. The Authority is confident that it would need to operate the hospital for no longer than two to three years until it finds an entity to replace HMA in the event of early termination of the lease.

 ¶ 37 An assertion that asset liquidity is merely a matter of degree with all investments and that this commercial real estate is, in fact, available in the event of an early termination of the hospital lease is contrary to how the Authority views this investment. The record shows that the amount invested in the real estate will not be readily available to the Authority for either operating the hospital or its repurchase in the event of HMA prematurely terminating the lease. The record shows that the Authority plans to use thirty million dollars of its Compounded Principal to own and lease commercial real estate for fifty (50) years with a thirty (30) year renewal option to a private redeveloper. The Authority is essentially stating that it no longer needs to put aside forty-six million dollars, with income derived therefrom, in case the hospital lease is prematurely terminated. The Authority's position is that it possesses the discretion to take thirty million of its sixty-seven million in Compounded Principal (45% of the Compounded Principal), and invest it in an ownership interest in

non-hospital-related commercial real estate with projected multi-year leases.

¶ 38 The Hospital Authority is correct in asserting that the Trust Indenture does not specify the exact investment for the forty-six million dollars and its income. However, the Trust Indenture clearly states that *all* of the Compounded Principal, all forty-six million dollars and income therefrom, is preserved until either termination of the lease or a vote of the people. The Trust Authority's position is based upon the premise that investing thirty million dollars from the Compounded Principal in a retail shopping mall qualifies as preserving that thirty million dollars to be available in the event of an early termination of the lease. However the Authority is also stating that this thirty million dollars is not necessary in the event of early termination of the lease. The Trust states that it was formed "to create and establish a trust ... to finance, operate, construct and administer hospital facilities, ..." O.R. at 486, Article I(1). The Trust Indenture indicates that the Compounded Principal is a source of funds to provide hospital facilities in the event of early termination of the lease, unless the people, by their votes, assign a different purpose.

¶ 39 The Trust Indenture provides that the Compounded Principal may be spent when a vote of the people directs such expenditure. We agree with Landowners that the Trust Indenture requires a vote of the people for the Authority to invest thirty million dollars from the Compounded Principal in a commercial real estate project for the purpose of the Authority becoming the owner of the real estate in that project.

## IV. Summary

¶ 40 We hold that the first issue raised on appeal is moot because the City is no longer seeking to invoke a municipal power of eminent domain. Injunctive relief against the City based upon this issue is moot, and we thus affirm the District Court's denial of an injunction on this issue. We reverse the judgment of the District Court and hold that 60 O.S.2001 § 178.4 applies to the Hospital Authority unless it may be exempted from application of this statute by other authority, and leave that question for a first-instance

determination by the District Court on remand, if necessary, in light of our final holding. We reverse the judgment of the District Court and hold that the Amended and Restated Trust Indenture of the Hospital Authority requires the Trustees to preserve the Compounded Principal in a form that will be available for expenditure in the event of early termination of the hospital lease, or available upon a vote of the people allowing such expenditure, and that a vote of the people is necessary for the Authority to invest thirty million dollars in this economic development project as the owner of the property. The matter is remanded to the District Court for further proceedings consistent with this opinion.

¶ 41 WATT, C.J., LAVENDER, HARGRAVE, KAUGER, WINCHESTER, TAYLOR, COLBERT, JJ.—Concur.