2008 OK 28

**CITY OF MIDWEST CITY and Midwest City Urban Renewal Authority, Appellees,**

v.

**HOUSE OF REALTY, INC., Appellant,**

and

**Robert J. Barton, Robert J. "Bob" Barton, Trustee, Pamela L. Barton–Stober, Douglas D. Stober, Kathy L. Givens, Sharlette R. Madison, Jeffrey C. Tackett, Harlan Drake, Phillis Casey, Larry Phillips, Iris Jones, Donna Gunter, Diane Frith, Richard Spriggs, Arthur Lewis and William Klukoske, Forrest Freeman, County Treasurer and Board of County Commissioners of Oklahoma County, Defendants.**

Nos. 104,349, 104,526.

Supreme Court of Oklahoma.

April 1, 2008.

Rehearing Denied Dec. 15, 2008.

---

See also, 100 P.3d 678.

Terry Guy Shipley, Norman, OK, for Appellant.

Katherine E.F. Bolles, City Attorney, City of Midwest City, Midwest City, OK, for Appellees, City of Midwest City and Midwest City Memorial Hospital Authority.

Joseph H. Bocock, Spencer Taft, McAfee & Taft, Oklahoma City, OK, James R. Waldo,

Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, OK, for Appellee, City of Midwest City.

James Dan Batchelor, Leslie V. Batchelor, John C. McMurry, Emily K. Pomeroy, Oklahoma City, OK, for Appellee, Midwest City Urban Renewal Authority.

WATT, J.

■ ¶1 The companion appeals are considered together and consolidated for the sole purpose of promulgating one opinion[1] addressing the three issues presented. The first is whether the landowner's due process[2] rights were denied by the City's publication notice of meetings at which blight[3] determinations were adopted. Second, whether the City complied substantially with the statutory requirements of 11 O.S.2001 § 38–106(B)[4] providing that a municipal governing body shall[5] not approve an urban renewal plan unless the governing body has determined, by resolution, that the area is blighted and

1. *In re Adoption of M.J.S.*, 2007 OK 43, ¶ 1, 162 P.3d 200; *City of Midwest City v. House of Realty, Inc. [Realty I]*, 2004 OK 56, ¶ 1, 100 P.3d 678.

2. The United States Const., amend XIV providing in pertinent part:
   "... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws...."
   The Okla. Const. art. 2, § 7 providing:
   "No person shall be deprived of liberty or property, without due process of law."

3. Title 11 O.S.2001 § 38–101(8) providing:
   " 'Blighted area' shall mean an area in which there are properties, buildings, or improvements, whether occupied or vacant, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation or open spaces; population overcrowding, improper subdivision or obsolete platting of land, inadequate parcel size; arrested economic development; improper street layout in terms of existing or projected traffic needs, traffic congestion or lack of parking or terminal facilities needed for existing or proposed land uses in the area, predominance of defective or inadequate street layouts; faulty lot layout in relation to size, adequacy, accessibility or usefulness; insanitary or unsafe conditions, deterioration of site or other improvements; diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land; defective or unusual conditions of title; any one or combination of such conditions which substantially impair or arrest the sound growth of municipalities, or constitutes an economic or social liability, or which endangers life or property by fire or other causes, or is conducive to ill health, transmission of disease, mortality, juvenile delinquency, or crime and by reason thereof, is detrimental to the public health, safety, morals or welfare ..."

4. Title 38 OS.2001 § 38–106 providing in pertinent part:
   "... (B) A municipal governing body shall not approve an urban renewal plan for an urban renewal area unless such governing body, by resolution, has determined such area to be a blighted area and designated each area or portion thereof, as appropriate for an urban renewal project. The municipal governing body shall not approve an urban renewal plan or project until a general plan for the municipality has been adopted as the long-range development policy, and such urban renewal plan shall adhere thereto; provided, however, that such general plan must have designated and delineated urban renewal areas, established the appropriate reuse of such areas and established priorities for the rehabilitation reuse of such areas and established priorities for the rehabilitation or clearance and redevelopment of such areas. The Urban Renewal Authority or a municipality shall not acquire real property for an urban renewal project unless the municipal governing body has approved the urban renewal plan in accordance with Subsection D of this section....
   D. The municipal governing body shall hold a public hearing on an urban renewal plan, after public notice thereof by publication at least one time not less than fifteen (15) days prior to the date of such public hearing, in a newspaper having general circulation in the area of operation of the municipality; and by posting not less than five (5) public notice signs, each having at least nine (9) square feet of display area, for a period of fifteen (15) successive days including the day of the public hearing for which notice is being given, in the area affected by the proposed urban renewal plan, and shall outline the general nature and scope of the urban renewal project under consideration...."

5. Generally, the use of "shall" signifies a command. *Zeier v. Zimmer, Inc.*, 2006 OK 98, ¶ 7, 152 P.3d 861; *Cox v. State ex rel. Oklahoma Dept. of Human Services*, 2004 OK 17, ¶ 21, 87 P.3d 607; *United States through Farmers Home Admin. v. Hobbs*, 1996 OK 77, ¶ 7, 921 P.2d 338. Nevertheless, there may be times when the term is permissive in nature. *Cox v. State ex rel. Oklahoma Dept. of Human Services*, this note,

may acquire properties subject to the plan only after its approval. Finally, whether the City acted arbitrarily, capriciously and in bad faith in making the blight determination.

¶2 As to the first issue, we hold that the City complied with due process requirements in providing publication notice [6] of meetings at which blight determinations were made. The determination is supported by: *Isaacs v. Oklahoma City,* 1966 OK 267, 437 P.2d 229,[7] *cert. denied,* 389 U.S. 825, 88 S.Ct. 63, 19

L.Ed.2d 79 (1967) in which this Court recognized that blight determinations are legislative rather than adjudicatory proceedings [8] coupled with a long line of Oklahoma jurisprudence holding that due process protections do not apply in legislative proceedings;[9] the lack of any requirement in either the Local Development Act or the Urban Renewal Act for personal notice of blight proceedings;[10] and the landowner's opportunity to enjoy the full range of due process protec-

supra; *Minie v. Hudson,* 1997 OK 26, ¶7, 934 P.2d 1082; *Texaco, Inc. v. City of Oklahoma City,* 1980 OK 169, ¶9, 619 P.2d 869

**6.** Title 25 O.S.2001 § 311 providing in pertinent part:
"A. Notwithstanding any other provisions of law, all regularly scheduled, continued or reconvened, special or emergency meetings of public bodies shall be preceded by public notice as follows:
1. All public bodies shall give notice in writing by December 15 of each calendar year of the schedule showing the date, time and place of the regularly scheduled meetings of such public bodies for the following calendar year....
4. All municipal public bodies, including, but not limited to, public trusts and any other bodies with the municipality as beneficiary, shall give such notice to the municipal clerk of the municipality wherein they are principally located....
9. In addition to the advance public notice in writing required to be filed for regularly scheduled meetings, all public bodies shall, at least twenty-four (24) hours prior to such meetings, display public notice of said meeting, setting forth thereon the date, time, place and agenda for said meeting, such twenty-four (24) hour prior public posting shall exclude Saturdays and Sundays and holidays legally declared by the State of Oklahoma; provided, however, the posting of an agenda shall not preclude a public body from considering at its regularly scheduled meeting any new business. Such public notice shall be posted in prominent public view at the principal office of the public body or at the location of said meeting if no office exists. 'New business', as used here, shall mean any matter not known about or which could not have been reasonably foreseen prior to the time of posting....
11. Special meetings of public bodies shall not be held without public notice being given at least forty-eight (48) hours prior to said meetings. Such public notice of date, time and place shall be given in writing, in person or by telephone means to the Secretary of State or to the county clerk or to the municipal clerk by public bodies in the manner set forth in paragraphs 2, 3, 4, 5 and 6 of this section.

The public body also shall cause written notice of the date, time and place of the meeting to be mailed or delivered to each person, newspaper, wire service, radio station, and television station that has filed a written request for notice of meetings of the public body with the clerk or secretary of the public body or with some other person designated by the public body. Such written notice shall be mailed or delivered at least forty-eight (48) hours prior to the special meeting.... In addition, all public bodies shall, at least twenty-four (24) hours prior to such special meetings, display public notice of said meeting, setting forth thereon the date, time, place and agenda for said meeting. Only matters appearing on the posted agenda may be considered at said special meeting. Such public notice shall be posted in prominent public view at the principal office of the public body or at the location of said meeting if no office exists. Twenty-four (24) hours prior public posting shall exclude Saturdays and Sundays and holidays legally declared by the State of Oklahoma...."

**7.** See also, *Board of County Comm'rs of Muskogee County v. Lowery,* 2006 OK 31, fn. 11, 136 P.3d 639, 21 A.L.R.6th 855.

**8.** *Isaacs v. Oklahoma City,* 1966 OK 267, ¶18, 437 P.2d 229, *cert. denied,* 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967) [There is no "judicial" authority conferred upon a municipality by the Urban Renewal Law.]

**9.** *Cox Oklahoma Telecom, L.L.C. v. State ex rel. Oklahoma Corporation Comm'n,* see note 26, infra; *Southwestern Bell Telephone Co. v. Oklahoma Corporation Comm'n,* see note 26, infra; *Henry v. Corporation Comm'n,* see note 26, infra; *State ex rel. Cartwright v. Southwestern Bell Telephone Co.,* see note 26, infra; *Horton v. City of Oklahoma City,* see note 26, infra; *Chickasha Cotton Oil Co. v. Corporation Comm'n,* see note 26, infra; *Gant v. City of Oklahoma City,* see note 26, infra; *Harrington v. City of Tulsa,* see note 26, infra; *City of Tulsa v. Weston,* see note 26, infra.

**10.** See, *Henry v. Corporation Comm'n,* note 9, supra.

tions in the condemnation proceedings.[11]

¶ 3 Second, under the facts presented, it is clear that blight determinations were made before the urban renewal plan was adopted and the City renewed its attempt to condemn the property at issue after the plan's adoption. Therefore, we determine that the City complied substantially with the statutory requirements of 11 O.S.2001 § 38–106(B).[12]

■ ¶ 4 Finally, we may overturn the City's blight determinations only if, in making the findings, it acted arbitrarily or capriciously.[13] There is no evidence of abuse. Rather, we hold that the record contains sufficient evidence to support a finding of blight.

## FACTS AND PROCEDURAL HISTORY[14]

¶ 5 In *City of Midwest City v. House of Realty, Inc. [Realty I]*, 2004 OK 56, 100 P.3d 678, the Court held that the City did not possess authority to exercise powers of eminent domain for purposes of economic development and the removal of blighted property under the Local Development Act, 62 O.S. 2001 § 850, *et seq.* We held in *House of Realty, Inc. v. City of Midwest City [Realty II]*, 2004 OK 97, 109 P.3d 314 that: 1) the

issue of whether the City could use a general power of eminent domain combined with the Local Development Act was rendered moot by the City's abandonment of attempts to condemn the landowner's property; 2) the cause should be remanded for a determination of whether authority existed exempting the public trust from the general prohibition against operating a retail outlet contained in 60 O.S.2001 § 178.4;[15] and 3) the amended and restated trust indenture of the public trust required a vote of the people before monies derived from the trust's compounded principal could be invested in the economic development project.

¶ 6 The companion appeals represent the third and fourth causes arising originally from a joint plan of the City and the Midwest City Memorial Hospital Authority (Hospital Authority) to redevelop approximately eighty acres on S.E. 29th Street (development area) in Midwest City. In these appeals, the only portion of the tract subject to condemnation is the landowner's one and one-forth (1 1/4) acre holding located near the northeast corner of S.E. 29th.

¶ 7 We recognized in *Realty I* that the City made a determination that the area at issue was blighted as early as May 28, 2002.[16] In

11. See, ¶¶ 17–19, infra, and accompanying footnotes.

12. Title 11 O.S.2001 § 38–106(B), note 4, supra.

13. *McConnell v. Town of Tipton*, see note 51, infra.

14. The facts necessary to the decision of *City of Midwest City v. House of Realty, Inc. [Realty I]*, see note 1, supra and *House of Realty, Inc. v. City of Midwest City [Realty II]*, 2004 OK 97, 109 P.3d 314, are outlined in the respective opinions. Only where necessary for the resolution of the companion appeals will those facts be repeated here.

15. Title 60 O.S.2001 § 178.4 providing in pertinent part:
"Trusts created under the provisions of Sections 176 through 180.55 of this title or any amendments or extensions thereof shall not include any trust purpose, function nor activity: in any wholesale outlet, unless said wholesale outlet is a direct part of the industry. Provided, however, that the distribution centers for intoxicating and nonintoxicating alcoholic beverages as defined in Title 37 of the Oklahoma Statutes shall not qualify under the

provisions of this title; nor shall it include a retail outlet unless said retail outlet is operated in conjunction with and on the same premises as the industrial, manufacturing, cultural, recreational, parking, transportation or airport facility . . ."
Although the section was amended in 2003, the language of the new statute is virtually identical to that quoted above.

16. *City of Midwest City v. House of Realty, Inc. (Realty I)*, see note 1 at ¶ 35, supra, providing in pertinent part:
"The City of Midwest City states that the property for its project is blighted for purposes of the Local Development Act. The City's [sic] made this determination using, with one exception, language from the Local Development Act. The City of Midwest City passed ordinance No. 2002–11 on May 28, 2002, and stated therein:
. . . 4. The Project Area is and was a blighted area because of each and a combination of the following factors: dilapidation, obsolescence, deterioration, presence of structures below minimum code standards, abandonment, excessive vacancies, arrested economic development, deleterious land use or layout,

response to the decisions in *Realty I* and *Realty II*, the City adopted Resolution No. 2004–19 on September 14, 2004. The resolution acknowledged that blight, consistent with the definition encompassed within Oklahoma's urban renewal laws, existed in the development area. The City also confirmed the May 28, 2002, finding of blight and directed that an urban renewal plan be prepared for the development area.[17] On October 12, 2004, the City adopted Resolution No. 2004–25, which specifically referred to the May 28, 2002, finding of blight and cited *Realty I* for the proposition that the Oklahoma urban renewal laws allowed municipalities to acquire properties through condemnation. Furthermore, the resolution adopted the Midwest City Downtown Urban Renewal Plan and authorized the acquisition of property through condemnation as identified in the plan.[18] The City's urban renewal plan provides for the obtaining of any properties not previously acquired by the Hospital Authority.[19]

¶ 8 The original commissioners' report issued on March 15, 2002; and the assessed damages were deposited with the court clerk. Requests to stay *Realty I* and *Realty II* were denied both by the trial court and this Court in the spring of 2004. Following the issuance

depreciation of physical maintenance and lack of community planning; and ..."

17. Resolution No. 2004–19, approved September 14, 2004, providing in pertinent part:
"... NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF MIDWEST CITY, OKLAHOMA:
1. The Council hereby finds and confirms that blighted areas as defined in the Urban Redevelopment Law of the State of Oklahoma, 11 O.S. §§ 38–101(8), exist within the corporate boundaries and jurisdiction of the City and that the rehabilitation, conservation, redevelopment or a combination thereof of such areas is necessary in the interest of the public health, safety, morals and welfare of the residents of such areas....
4. The Council hereby confirms its previous finding in Resolution No. 2002–11 on May 28, 2002, that the area depicted on the map attached to this resolution as Exhibit A is and was a blighted area because of each and a combination of the following factors; dilapidation, obsolescence, deterioration, presence of structures below minimum code standards, abandonment, excessive vacancies, arrested economic development, deleterious land use or layout, depreciation of physical maintenance and lack of community planning....
6. The Council hereby finds it appropriate and directs that an urban renewal plan be prepared for the area depicted on the map attached to this resolution as Exhibit A in order to aide in the planning, undertaking and carrying out of the objectives of the Project Plan...."

18. Resolution No. 2004–25, October 12, 2004, providing in pertinent part:
... WHEREAS, the City Council found on May 28, 2002 in Resolution No. 2002–11, that the Project Area suffered from blighting conditions identified in the Oklahoma Urban Renewal Law, 11 O.S. § 38–101(8), and that the Project Area 'is and was a blighted area because of each and a combination of the following fac-

tors: dilapidation, obsolescence, deterioration, presence of structures below minimum code standards, abandonment, excessive vacancies, arrested economic development, deleterious land use or layout, depreciation of physical maintenance and lack of community planning'
...
WHEREAS, on June 29, 2004, the Oklahoma Supreme Court in *City of Midwest City v. House of Realty, Inc.*, 2004 OK 56, 100 P.3d 678, decided that the City, in relying on its general municipal powers including those granted in 11 O.S. §§ 22–104(3) and (8) to condemn property, 'did not possess authority pursuant to its general eminent domain powers to condemn the property apart from those statutes regulating the joint conduct of municipalities and public trusts when removing blighted property and creating economic redevelopment' and the Court specifically determined that the Oklahoma Urban Renewal Law, 11 O.S. §§ 38–101–38–123, is one of two such statutes under which the authority to condemn for redevelopment exists; and ...
2. The Midwest City Downtown Urban Renewal Plan, having been duly reviewed and considered, is hereby adopted and approved
...
6. It is hereby found and determined that it is necessary, appropriate, and desirable to authorize the Midwest City Urban Renewal Authority to acquire property by eminent domain as provided in the Midwest City Downtown Urban Renewal Plan ...."

19. Midwest City Urban Renewal Plan providing at § IV. A:
"*Acquisition.* Acquisition of the redevelopment project property within the project area by the Midwest City Urban Renewal Authority is authorized, including acquisition by exercise of eminent domain, to carry out the purposes of the urban renewal plan in accordance with 11 O.S. § 38–111, excluding properties previously acquired by the Midwest City Memorial Hospital Authority."

of mandate in *Realty I*, on April 29, 2004, the City took possession of the landowner's property, demolishing the structures on the tract. Except for the existence of one retail outlet, the entire project area was cleared by July of 2004.

¶ 9 On November 20th and 21st, 2006, a two day bench trial was held to resolve issues on remand from *Realty II* and in response to the City's declaratory judgment action requesting approval of the City's Urban Renewal Plan along with the renewed attempt to condemn the landowner's property. The trial court consolidated the two causes; sustained the City's findings of blight; found the City's urban renewal plan to have been validly adopted in accordance with the urban renewal laws, 11 O.S.2001 § 38–101, *et seq.*; and denied the landowner's exceptions to the commissioners' report. Petitions in error were filed in the two causes in February and March of 2007, respectively. On April 13, 2007, the landowner filed a motion to consolidate the related appeals. The City requested that the causes be retained in its motion of May 3, 2007. We made the causes companion cases and granted the motion to retain. The briefing cycle was completed on December 11, 2007.

## DISCUSSION

¶ 10 **a. The City met due process requirements by providing publication notice of meetings at which blight determinations were made.**

■ ¶ 11 The landowner asserts that the City's blight determinations were judicial in that they were adjudications of the "character of the use" pursuant to the Oklahoma Constitution art. 2, § 24.[20] He also contends that due process required that he receive: personal notice of the City's meetings in which blight determinations were considered; a full hearing on the blight issue; the opportunity to present witnesses; and the right to cross examine the City's witnesses. The City argues that all due process require-

ments were satisfied by publication notice of meetings at which blight conditions were considered and through the landowner's opportunity to appear and defend against the taking in district court. It asserts that the blight determinations did not amount to a taking, but rather were legislative determinations not subject to the full range of due process protections. We agree with the City's arguments.

¶ 12 **1) Where, as here, the Legislature has provided the statutory standard for a finding of blight, the determination is legislative rather than judicial in nature.**

¶ 13 The line between what is legislative and what is judicial is not always a clear one. We agree with the landowner that blight is the public purpose that constitutionally justifies the subsequent sale of property for private use.[21] Nevertheless, the City's failure to give the landowner personal notice of its intent to consider the issue of blight did not constitute a violation of due process.

¶ 14 The Court answered the question of whether a municipality's determination of blight under urban renewal statutes constituted a judicial determination in *Isaacs v. Oklahoma City*, 1966 OK 267, 437 P.2d 229, *cert. denied*, 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967). At issue in *Isaacs* was the constitutionality of urban redevelopment/renewal laws allowing blighted property to be condemned. One ground upon which the urban renewal laws were attacked was that they allowed a municipality, like Midwest City here, to "judicially" determine blighted areas. In resolving the issue, the Court stated in pertinent part at ¶ 18:

> "... The act does authorize the city to declare and identify blighted areas, but only according to the standards set forth in the act. **Such determination is manifestly not an exercise of 'judicial' authority.** There is no 'judicial authority' conferred

**20.** The Okla. Const. art. 2, § 24 providing in pertinent part:

"... In all cases of condemnation of private property for public or private use, the determination of the character of the use shall be a judicial question."

**21.** *City of Midwest City v. House of Realty, Inc [Realty I]*, see note 1, supra.

upon the city by the act." [22] [Emphasis provided.]

Just as the Legislature set forth the standard necessary for a determination of blight in the urban renewal statute at issue in *Isaacs,* it has done so in 11 O.S.2001 § 38–101(8) providing:

" 'Blighted area' shall mean an area in which there are properties, buildings, or improvements, whether occupied or vacant, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation or open spaces; population overcrowding, improper subdivision or obsolete platting of land, inadequate parcel size; arrested economic development; improper street layout in terms of existing or projected traffic needs, traffic congestion or lack of parking or terminal facilities needed for existing or proposed land uses in the area, predominance of defective or inadequate street layouts; faulty lot layout in relation to size, adequacy, accessibility or usefulness; insanitary or unsafe conditions, deterioration of site or other improvements; diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title; any one or combination of such conditions which substantially im-

pair or arrest the sound growth of municipalities, or constitutes an economic or social liability, or which endangers life or property by fire or other causes, or is conducive to ill health, transmission of disease, mortality, juvenile delinquency, or crime and by reason thereof, is detrimental to the public health, safety, morals or welfare . . ."

The combination of this Court's holding in *Isaacs* and the Legislature's establishment of a standard for the blight determination pursuant to 11 O.S.2001 § 38–101(8), makes it clear that the City's blight finding was legislative in nature.

¶ 15 **2) There is no statutory requirement for individual notice before a municipality may make a blight determination. Absent such a statutorily imposed standard, due process is not violated by lack of personal notice concerning a municipality's legislative actions.**

■ ¶ 16 Neither the Local Development Act,[23] under which the original blight determination was made, nor the urban renewal laws [24] require that the landowner receive personal notice of the City's blight determination. Absent such a statutorily imposed notice requirement,[25] due process of law is not violated because the property owner did

---

22. Other courts have likewise held that a blight determination is a legislative act. See, *Norfolk Redevelopment & Housing Auth.v. C & C Real Estate, Inc.,* 272 Va. 2, 630 S.E.2d 505 (2006); *Aposporos v. Urban Redevelopment Comm'n of City of Stamford,* 259 Conn. 563, 790 A.2d 1167 (2002); *State ex rel. United States Steel v. Koehr,* see note 28, infra; *Real Pipe & Valve Co., Inc. v. Consolidated City of Indianapolis–Marion County,* 633 N.E.2d 274 (Ind.App.1994), see note 28, infra; *In re City of Scranton,* 132 Pa.Cmwlth. 175, 572 A.2d 250 (1990), *appeal denied,* 527 Pa. 131, 589 A.2d 204 (1991) and 527 Pa. 619, 590 A.2d 760 (1991); *Apostle v. City of Seattle,* 77 Wash.2d 59, 459 P.2d 792 (1969); *Anaheim Redevelopment Agency v. Dusek,* 193 Cal.App.3d 249, 239 Cal.Rptr. 319 (1987).

23. Title 62 O.S. Supp.2003 § 859 providing in pertinent part:

"A. Before the adoption of a project plan or subsequent amendments thereto, the governing body must hold two public hearings. . . .
B. Notice of the first public hearing shall be given once by publication in a newspaper with

circulation in the city, town or county. Such notice must be published no later than fourteen (14) days before the date of the public hearing. . . .
C. Notice of the second public hearing may be included in the publication notice provided for in subsection B of this section. Notice of the second public hearing shall be published in the same manner as the notice provided for in subsection B of this section . . .
E. Technical irregularities in the form of the notice required by this section shall not result in the invalidation of any ordinance enacted or amended subsequent thereto, so long as the notice, as published, reasonably apprises interested parties as to the subject matter of the hearings and correctly describes the date, time and place of such hearings."

24. Title 11 O.S.2001 § 38–106(D), see note 4, supra.

25. *Henry v. Corporation Comm'n,* see note 26, infra; *Chickasha Cotton Oil Co. v. Corporation Comm'n,* see note 26, infra;

not get personal notice or an opportunity to

be heard during the council meetings concerning blight.[26]

**26.** *Cox Oklahoma Telecom, L.L.C. v. State ex rel. Oklahoma Corp. Comm'n,* 2007 OK 55, ¶¶ 14–16, 164 P.3d 150; *Southwestern Bell Telephone Co. v. Oklahoma Corp. Comm'n,* 1994 OK 38, ¶ 9, 873 P.2d 1001, *cert. denied,* 513 U.S. 869, 115 S.Ct. 191, 130 L.Ed.2d 123 (1994); *Henry v. Corporation Comm'n,* 1990 OK 103, 1990 OK 104, ¶ 9, 825 P.2d 1262; *State ex rel. Cartwright v. Southwestern Bell Telephone Co.,* 1983 OK 40, ¶ 23, 662 P.2d 675; *Horton v. City of Oklahoma City,* 1977 OK 87, ¶ 20, 566 P.2d 431, *appeal dismissed,* 434 U.S. 1056, 98 S.Ct. 1222, 55 L.Ed.2d 755 (1978); *Chickasha Cotton Oil Co. v. Corporation Comm'n,* 1977 OK 40, ¶ 4, 562 P.2d 507, *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 88 (1971); *Gant v. City of Oklahoma City,* 1931 OK 241, ¶ 5, 6 P.2d 1065, 86 A.L.R. 794, *appeal dismissed,* 284 U.S. 594, 52 S.Ct. 203, 76 L.Ed. 512 (1932); *City of Tulsa v. Weston,* 1924 OK 578, ¶ 42, 229 P. 108, *error dismissed,* 269 U.S. 540, 46 S.Ct. 202, 70 L.Ed. 401 (1926); *Chicago, R.I. & P.Ry. Co. v. State,* 1917 OK 471, ¶ 6, 168 P. 239. See also, *Utley v. St. Petersburg,* 292 U.S. 106, 54 S.Ct. 593, 78 L.Ed. 1155 (1934), *rehearing denied,* 292 U.S. 604, 54 S.Ct. 712, 78 L.Ed. 1466 (1934); *New York & New England Railway Co. v. Town of Bristol,* 151 U.S. 556, 14 S.Ct. 437, 38 L.Ed. 269 (1894); *Harrington v. City of Tulsa,* 1934 OK 711, ¶ 0, 39 P.2d 120.
The landowner does not contend that the publication notice given violated provisions of the Oklahoma Open Meeting Act (Open Meeting Act), 25 O.S.2001 § 301, *et seq.,* or the Urban Removal Act, 11 O.S.2001 § 38–101, *et seq.* Furthermore, the record contains testimony indicating that the notice required pursuant to the Open Meeting Act was provided for each meeting at which the blight determinations were considered along with special notice requirements of the Urban Renewal Act.
Transcript of proceedings, November 21, 2006, Katherine Bolles, City Attorney for the City, providing in pertinent part at pp. 322–325:
"...... Q. And what's your position with City of Midwest City?
A. I have been the city attorney there since 1991.
Q. And as part of your job as city attorney, are you responsible for assuring that there's proper notice of city council functions?
A. Yes, sir.
Q. I'm going to ask you very briefly about notice for the various resolutions that are before the Court in this case. Will you share with us and the Court what kind of notice, if any, was provided regarding Exhibit 3, which is Resolution 2002–11, which is the May 28th, 2002, finding of blight?
A. Most resolutions don't require any special notice. This resolution would have been advertised or published in the agenda for the city council meeting the 28th day of May, 2002, which indicates to me that it was a regular meeting.

So notice for all regular meetings of political subdivision of the state, of which the City is one, has to be filed with the city clerk prior to December 15th for the following year, all regular meetings.
This was a regular meeting, so that notice would have been filed. Then the agenda that contained this item would have been posted in excess of 24 hours prior to the meeting in view of the public.
Q. And that's in accordance with the Open Meetings Act?
A. That is in—we always operate in strict accordance with the Oklahoma Open Meetings Act.
Q. How about Exhibit 5, Resolution 2004–19, which is the September 14th city council resolution reaffirming blight existing in this area?
A. It would have been advertised in the same way. And as I say, normal resolutions such as this do not require any additional or special publication or posting requirements.
Q. And would your answer be the same for Exhibit 4, which is Ordinance 2852, ... adoption of—excuse me the adoption of the project plan in 2002?
A. There is a little bit—there's not additional posting requirements, but because this is an emergency ordinance, it does have to be listed as such on the agenda, and this was listed as such on the agenda.
Q. The specific ordinance?
A. The specific ordinance was listed on the agenda, but also the fact that it was an emergency ordinance, it does have to be identified as an emergency ordinance and the emergency clause has to be acted on separately, and it was...."
Title 11 O.S.2001 § 38–106(D), see note 3, supra.
Transcript of proceedings, November 20–21, 2006, Katherine Bolles, City Attorney for the City, providing in pertinent part at pp. 325–6:
Q. Same—same question, the kind of notice as to Exhibit 8, Resolution 2004–25, which is the Urban Renewal Act, adoption of the Midwest City Downtown Urban Renewal Plan.
A. The adoption of the Urban Renewal Plan does-because it is done at a public meeting, has to receive the same types of notice requirements as far as publishing on the agenda and posting it, because it also requires addition-it also has additional publication requirements as well, and those were satisfied in this case....
Q. ... And the last two, the Urban Renewal Authority meetings, one referred to in Landowner's Exhibit 27, the Urban Renewal Authority meeting of September 16, 2004, and October 13, 2004, which is Exhibit 20A.
A. Now, the Urban Renewal Authority meetings would have been a little bit different in that because they don't—meetings like the city council does or the hospital authority does, those would have been all special meetings, and so special meetings, the notice has to be

¶ 17 **3) The landowner became entitled to and was afforded the full range of due process protections in the condemnation proceedings.**

■ ¶ 18 Although necessity is not to be equated with public use or public purpose,[27] the Court's opinion in *Pippin v. Board of Comm'rs of Okmulgee County,* 1922 OK 305, 209 P. 929 is instructive on the issue of when due process protections are to be afforded in a condemnation proceeding. In *Pippin,* the landowner asserted that the statutory scheme allowing the commissioners' determination that his property was necessary for highway construction, without prior personal notice of the meeting at which the issue was to be considered, was unconstitutional. The *Pippin* Court disagreed. It held that the commissioners' decision regarding public necessity could not be equated with a taking. The Court reasoned that the determination did not authorize any individual to enter the landowner's property. Rather, it was a preliminary step necessary to allow the institution of condemnation proceedings. Furthermore, the opinion acknowledged that the due process of law promised by the Constitution was afforded to the property owner through participation in the condemnation proceedings.[28]

---

filed with the city clerk at least 48 hours prior to the meeting, and then an agenda posted for in excess of—for at least 24 hours prior to the meeting occurring, and that was done for those meetings of the Urban Renewal Authority.

Q. ... I think I asked you about the Ordinance 2852, which is exhibit 40. Do you recall that testimony?

A. Yes, sir.

Q. And did you cause publication in the local newspaper to be made concerning the adoption of that ordinance?

A. Yes. There's a requirement under the Urban Renewal laws that it be published once prior to the hearing, and that was done. We do have an affidavit of publication...."

27. *Board of County Commissioners of Muskogee County v. Lowery,* see note 7, supra.

28. *Arthur v. Board of Comm'rs of Choctaw County,* 1914 OK 181, ¶ 15, 141 P. 1. See also, *Brody v. Village of Port Chester,* 434 F.3d 121 (2nd Cir.2005) [Although the landowner relies on this cause on the notice issue, the federal court made it clear that a property owner has no due process right to participate in the initial decision by a governmental authority to exercise eminent domain. The opinion providing in pertinent part: "[a]side from the inherent lack of logic in the claim that Brody is entitled to a hearing on the issue of public use *before* the Village makes its determination, such a rule would impose an impossible burden on the condemnor and would represent an unwarranted judicial arrogation of the legislature's power to condemn."]; *Trager v. Peabody Redevelopment Auth.,* 367 F.Supp. 1000 (D.Mass.1973) [The mere determination by a governmental authority that a particular area of real estates is "blighted" as an initial step in an urban renewal project is not a constructive taking even though the determination has an adverse effect on the value of the property.]; *Matter of Condemnation by Urban Redevelopment Auth. of Pittsburgh,* 527 Pa. 550, 594 A.2d 1375 (1991), *cert. denied,* 502 U.S. 1004, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991) [Certification of blight is not an adjudication having legal effect on property rights.]; *State ex rel. United States Steel v. Koehr,* 811 S.W.2d 385 (Mo.1991) [Due process does not require owner be given notice that property was included in area subject to be declared as blighted.]; *David Jeffrey Co. v. City of Milwaukee,* 267 Wis. 559, 66 N.W.2d 362 (1954) [Determinations of blight do not constitute an appropriation of property in the area designated as blighted necessitating due process procedures.]; *Concerned Citizens of Princeton, Inc. v. Mayor & Council of Borough of Princeton,* 370 N.J.Super. 429, 851 A.2d 685 (2004), *cert. denied,* 182 N.J. 139, 861 A.2d 844 (2004) [Borough was not required to serve notice upon landowners or businesses. Sufficient notice was achieved by public notice.]; *Reel Pipe & Valve Co., Inc. v. Consolidated City of Indianapolis–Marion County,* 633 N.E.2d 274 (Ind.App.1994), *cert. denied,* 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994) [Landowners not entitled to actual notice of public hearing at which blight determination is made]. See also, *Griggs v. Borough of Princeton,* 33 N.J. 207, 162 A.2d 862 (1960) [Even where statute provided for personal notice, blight determination would not be invalidated for failure to follow statutorily mandated procedures.]; "Eminent Domain: Due Process in the Certification Process is Attenuated," 21–DEC Real Est. L.Rep. 5 (1991) [Analyzing Pennsylvania law and noting that due process issues do not come into play during the stage of proceedings in which blight is determined because the certification does not inevitably lead to condemnation and a deprivation of property.]; But see, *Merrill v. City of Manchester,* 124 N.H. 8, 466 A.2d 923 (1983) [Property owners' equal protection rights were violated when they were denied a hearing before determination of blight was made.]; *W & G Co. v. Redevelopment Agency of Salt Lake City,* 802 P.2d 755 [Utah App.1990] [Individual notice required under the statutory scheme.]; *In re City of Scranton,* see note 22, supra [No rights of property owner are affected at time of certification of blight which would require implementation of due process procedures.].

¶ 19 Under the reasoning in *Pippin,* due process protections do not arise at the stage where an initial determination of blight is considered by a governmental authority. The rights of personal notice, the opportunity to be heard, and to cross–examine witnesses are appropriate and must be afforded when a landowner's property becomes subject to forfeiture. Here, the landowner does not argue that he was denied due process in the condemnation proceeding. Indeed, he has exercised those rights vigorously over the last eight years.[29]

¶ 20 **b. The City complied substantially with the statutory requirements of 11 O.S.2001 § 38–106(B) providing that a municipal governing body may approve an urban renewal plan after the governing body has determined, by resolution, that the area is blighted, and may begin the acquisition of properties subsequent to the adoption of the urban renewal plan.**

■ ¶ 21 At issue are the procedural requirements of 11 O.S.2001 § 38–106(B) providing in pertinent part that:

"A municipal governing body shall not approve an urban renewal plan for an urban renewal area unless such governing body, by resolution, has determined such area to be a blighted area and designated such area **or portion thereof,** as appropriate for an urban renewal project.... The Urban Renewal Authority or a municipality shall not acquire real property for an urban renewal project unless the municipal governing body has approved the urban renewal plan ..." [Emphasis provided.]

¶ 22 The landowner's arguments regarding the City's failure to follow the urban renewal laws largely regard timing issues under 11

O.S.2001 § 38–106(B).[30] The landowner asserts that, pursuant to the statute, blight determinations must precede the adoption of an urban renewal plan and that properties in the development area may not be acquired until after an urban renewal plan is adopted. The City does not dispute the landowner's contentions. Rather, it insists that it complied with the procedural requirements of the urban renewal laws by making valid blight determinations before the urban renewal plan was adopted in October of 2004. Furthermore, the City insists that any properties acquired before the adoption of the urban renewal plan were purchased, not in contemplation of urban renewal, but rather by the Hospital Authority pursuant to the Local Development Act. Finally, it contends that the property it is attempting to acquire pursuant to the urban renewal plan extends only to the landowner's real estate. We agree that the City complied substantially with the statutory requirements of 11 O.S.2001 § 38–106(B).[31]

¶ 23 **1) The City's blight determination, originally made on May 28, 2002, and subsequently reconfirmed on September 14, 2004, preceded the City's adoption of an urban renewal plan on October 12, 2004.**

¶ 24 This Court recognized in *Realty I* that the City originally adopted a finding of blight in Resolution No. 2002–11 on May 28, 2002, for purposes of the Local Development Act.[32] We also acknowledged that the presence of blight could be based upon a single factor when applying the urban renewal statutes and that the definition of blight included within the Local Development Act encompassed blighted areas as defined by the urban renewal laws.[33]

**29.** See, *Pippin v. Board of Comm'rs of Okmulgee County,* 1922 OK 305, 209 P. 929. See also, *City of Midwest City v. House of Realty, Inc. [Realty I],* note 1, supra; *House of Realty, Inc. v. City of Midwest City [Realty II],* note 14, supra.

**30.** Title 11 O.S.2001 § 38–106(B), see note 4, supra.

**31.** *Id.*

**32.** See, note 16, supra.

**33.** *City of Midwest City v. House of Realty, Inc., [Realty I],* see note 1, supra, providing in pertinent part:

at ¶ 20 "... [T]he presence of blight may be based upon the presence of a single factor when applying the Urban Renewal Act ..."; at ¶ 30 "Although the definition of a 'blighted area in § 853 includes a blighted area as defined ... [by the Urban Renewal Act'],' § 853 does not require applying the Urban Renewal definition ..."

¶ 25 On September 14, 2004, the City confirmed that the project area contained blighted areas as defined under the Urban Redevelopment Law in Resolution No. 2004–19 and readopted its earlier finding of blight of May 28th, 2002.[34] Resolution 2004–25, adopted on October 12, 2004, also contained blight findings and referred to the original determination of blight made on May 28, 2002. This resolution also accepted the plan for urban renewal.[35] Under these facts, the landowner's argument that there was no blight determination before the plan for urban renewal was adopted is unconvincing.

¶ 26 **2) The City did not renew its attempt to acquire the landowner's property for urban renewal purposes until after the Urban Renewal Plan was adopted on October 12, 2004.**

¶ 27 The Urban Renewal Plan was adopted on October 12, 2004, pursuant to Resolution No. 2004–25.[36] Any properties acquired before that date were either purchased or condemned under the Local Development Act. They were not acquired for purposes of urban renewal.

■ ¶ 28 Nothing in 11 O.S.2001 § 38–106(B)[37] commands that all properties within an entire project area be acquired pursuant to the urban renewal plan. Rather, the statute merely provides that the project area

have a blight determination before the adoption of an urban renewal plan and that "**a portion thereof**" be appropriate for urban renewal.[38] The urban renewal plan acknowledged not only that some properties within the project had been acquired previously, but that only real property not previously obtained would be subject to acquisition pursuant to the urban renewal plan.[39]

¶ 29 The landowner's real estate is the only property subject to acquisition under the urban renewal plan. It is the property identified in the urban renewal plans as the "real property not previously obtained." Only after adoption of the urban renewal plan did the City renew attempts to obtain the landowner's property through condemnation proceedings.

¶ 30 The facts demonstrate that there were blight determinations which preceded the City's adoption of an urban renewal plan and that the only property subject to condemnation under the plan was the landowner's real estate. Under these facts, the City complied substantially with the requirements of 11 O.S.2001 § 38–106(B).[40]

¶ 31 **c) The City did not act arbitrarily, capriciously or in bad faith in making its determinations of blight.**

■ ¶ 32 The landowner makes a final, catch all argument[41] that the trial court

---

The landowner does not contend that the factors cited as constituting blight in the May 28th ordinance are insufficient to meet the definition of blight contained in the urban renewal laws. We note that the factors listed in the May 28th resolution as constituting blight, see note 16, supra, encompass a number of the factors listed in 38 O.S.2001 § 38–101(8), see note 3, supra, defining blight for urban renewal purposes.

**34.** See, Resolution No. 2004–19, approved September 14, 2004, note 17, supra.

**35.** See, Resolution No. 2004–25, approved October 12, 2004, note 18, supra.

**36.** *Id.*

**37.** Title 11 O.S.2001 § 30–106(B), see note 4, supra.

**38.** If a statute is plain and unambiguous and its meaning clear, no occasion exists for the rules of construction. Rather, the statute will be accorded the meaning expressed by the legislative lan-

guage utilized. *Wylie v. Chesser*, 2007 OK 81, ¶ 19, 173 P.3d 64; *Wilson v. Catoosa Public Schools*, 2007 OK 20, ¶ 11, 157 P.3d 1149; *Heldermon v. Wright*, 2006 OK 86, ¶ 12, 152 P.3d 855.

**39.** *Midwest City Urban Renewal Plan*, see note 19, supra.

**40.** Title 11 O.S.2001 § 38–106(B), see note 4, supra.

**41.** Four of the eight contentions involved relate to the issue of the City's blight determinations. The arguments are that the City's actions must be arbitrary and capricious and executed in bad faith, because: 1) the first blight determination was made May 28, 2002, almost two years after the City commenced acquiring property in the Project area; 2) the first blight determination was made only after the Landowner challenged the City's right to take under the general condemnation statutes and then was pursued under the Local Development Act; 3) the 2004 blight

erred in overruling its exceptions to the commissioners' report because the City acted arbitrarily, capriciously and in bad faith in making the blight determinations. The City asserts that the argument lacks all evidentiary support. The City's actions do not rise to a level warranting our intervention.[42]

¶ 33 Because statements by City officials initially indicated that the revamping of downtown Midwest City was needed to improve the public image, the landowner is convinced that the City's utilization of blight to justify condemnation proceedings was in bad faith. The assertion in unconvincing. There is no question that one of the main goals when the project plan was initially considered was economic development. Nevertheless, the question presented in *Realty I* was:

"[W]hether a municipality's authority to condemn property **for economic redevelopment and blight removal** is limited to special statutes expressly giving such authority, or in the alternative whether a municipality may condemn property **for blight removal and economic development** pursuant to a general power of eminent domain." [Emphasis added.]

The language in *Realty I* makes it clear that, from the instigation of the City's first attempts to obtain properties in the project area, blight served as at least one basis for the City's actions.

¶ 34 The landowner relies upon statements by a City official and a council member as presenting evidence of the City's bad faith. The first was noted in *Realty I* and involved a statement by the City's Development Services Director that the City proceeded, initially, under the Local Development Act because it believed that the property didn't meet all the definitions of blighted conditions. The second concerned a statement by a council member regarding the September 14, 2004, council meeting. Evidently, the council member was asked whether the meeting would affect the landowner's property. The council member indicated the meeting would involve urban renewal but that it would not involve the landowner's property. Finally, the landowner takes exception to a statement made by the redeveloper indicating that the landowner's property was needed in 2004 to satisfy an anchor tenant rather than for the elimination of blight.

¶ 35 The governing body of a municipality is its city council.[43] The powers of a municipal government are exercised through the council as a whole rather than by any single council member or city official.[44] There is no evidence that either of the statements made by the City employee or by its council member were in bad faith or with the express intent to mislead the landowner. If an individual council member or employee cannot speak for the council as a whole, it follows that a contractor also lacks such authority.

¶ 36 Finally, the landowner points to evidence of bad faith in the 2004 blight determinations based on the fact that, by that point in time, the land had been cleared and some improvements were underway. The argument ignores the fact that the first blight determination was made in 2002, and that

determinations were made after the project area, except for the Landowner's 1–1/4 acre tract had been cleared of all structures; and 4) the September 14, 2004, blight determination referred to no supporting evidence; and the October 12, 2004, blight determination was based upon a September 30, 2004, "Report of Conditions" which expounded upon conditions which had been remedied. Our determination that the City's blight determinations conformed substantially with 11 O.S.2001 § 38–106(B), see note 4, supra, make it unnecessary to address these contentions.

**42.** A condemnor's decision as to the necessity for taking property will not be disturbed in absence of fraud, bad faith, or abuse of discretion. *Pub-lic Service Co. of Oklahoma v. Willis*, 1997 OK 78, ¶ 14, 941 P.2d 995; *Rueb v. Oklahoma City*, 1967 OK 233, ¶ 0, 435 P.2d 139. A trial court's decision regarding the necessity of the taking will not be disturbed on review unless clearly against the weight of the evidence. *Cunningham v. State ex rel. Oklahoma Planning & Resources Bd.*, 1954 OK 349, ¶ 0, 277 P.2d 990.

**43.** Title 11 O.S.2001 § 1–102 providing in pertinent part:

"As used in the Oklahoma Municipal Code:
... 3. 'Governing body' ... means the city council of a city ..."

**44.** See, *Blinn v. Hassman*, 1933 OK 37, ¶ 0, 18 P.2d 881.

each of the subsequent determinations related back to the 2002 determination and to the factors which existed in 1999 when the original attempt to acquire the properties was initiated.

¶ 37 The record is replete with evidence to support the existence of blight in the project area. Along with structures which continued to deteriorate,[45] property located adjacent to the landowner's structure was suffering from soil contamination,[46] while the landowner's building and surrounding area was showing signs of age and deterioration and the lack of adequate parking.[47] There were other buildings in the area which had asbestos[48] or gasoline contamination.[49] Even after the land was cleared, the City continued to deal with public utility deficiencies.[50]

45. Transcript of proceedings, November 20–21, 2006, William DeWayne Harless testifying in pertinent part at pp. 219–20:

"... Q. Between April of 2000 when this picture was taken and May 28th, 2002, when the determination of blight was made, did the shopping center get any bettor or any worse?
A. No, it got—it got worse...."

46. Transcript of proceedings, November 20–21, 2006, William DeWayne Harless testifying in pertinent part at p. 225:

"... Q. All right. And would you tell Her Honor, using Exhibit 23A immediately to your right, where this property would be located? We can see—especially in relation to the subject.
A. This property is located right here (indicating).
Q. Adjacent to the Barton property?
A. Yes....
Q. We're—the building, of course, I could ask you about age and obsolescence, but let's talk about imperiling public safety, which we'll talk about in a minute. How does—how does this property imperil public safety, in light of what you just testified to?
A. Well, public safety, you—you never want your—your soil contaminated or—or your ground water contaminated with pollutants...."

47. Transcript of proceedings, November 20–21, 2006, William DeWayne Harless testifying in pertinent part at pp. 229–30:

"... Q. Okay. What does this show about—and this is, of course, the House of Realty office. Could you tell Her Honor what this shows about age and deterioration of buildings and so forth, setbacks and parking and signage and all that.
A. It's—clearly—clearly the City would not permit a building to go in with setbacks on a-on a major arterial road such as Air Depot, but also it shows just the deteriorating aspects of the building, parking issues...."

48. Transcript of proceedings, November 20–21, 2006, William DeWayne Harless testifying in pertinent part at p. 232:

"... Q. ... [C]ould you show to the Court where the old Skytrain Movie Theater is?
... Q. And why is it in red in you chart, which is Exhibit 23A?
A. That building was found to have asbestos contamination in it...."

49. Transcript of proceedings, November 20–21, 2006, William DeWayne Harless testifying in pertinent part at p. 243:

"... Q. You're talking about here (indicating)?
... A. That is the same building that has the asbestos found in it, and you can see it in the rear, before it was remediated. But also in the forefront here, this is the-the building that was some type of dentist or doctor's office at one time and had the basement that had gasoline contamination in it...."

50. Transcript of proceedings, November 20–21, 2006, William DeWayne Harless testifying in pertinent part at pp. 240–41:

"... Q. ... Could you explain to Her Honor, generally speaking, what you had—what you had to do, what you are doing in order to eliminate this insanitary and unsafe conditions?
A. Well, we—we are—are still rectifying some of those, but in general in the area, when things were constructed back in the '50s as far as water lines, sewer lines, storm water—storm water retention, things like that, they were not up to today's standards.
For example, when I say we're still rectifying some of those today, on the very—the very eastern part of the project serves—serves this area. We're doing a pipe bursting project because the-the-the sewer lines have deteriorated to the point that—that they're—they're—they're almost useless. We had to do that along the northern part of the property as well. But that is an example of all of the utilities in the area—that were deteriorating. Fire—fire require—fire department requirements, we have one of the best fire departments in the-in the country, and in order to-to-to accomplish that, they—they look at our—our water line systems and stuff. This was served with undersized water lines. Fire hydrant spacing has—has changed and so on.
Q. Let's look at photograph 24–U. This was taken in January of 2002, as indicated on the top of the photograph in the Court's exhibit book. We've seen this before in opening. What does this show Her Honor, if anything, about insanitary or unsafe conditions on the property?

¶ 38 Courts may legitimately interfere in legislative functions of municipalities when the governmental authority has acted unreasonably, arbitrarily or in such a way as to constitute a violation of constitutional guarantees of equal protection or due process.[51] Unreasonable acts by cities have been defined as those which are manifestly unreasonable and oppressive, unwarrantedly invade private rights, clearly transcend the police power given them, or infringe upon the rights secured by fundamental law.[52]

¶ 39 Once only his property rights were at issue, we agree with the landowner that the better practice would have been to give him individual notice of all proceedings which might have impacted his property or the ownership thereof. The cases here being the third and forth time that the matter appears before this tribunal is demonstration in and of itself that it would have been a saving to the litigants and to the judicial system if the City had proceeded originally under the laws governing urban renewal projects. We can understand the landowner's frustration with having received information from City employees and council members he believes to have been misleading. Nevertheless, under the facts presented, we hold that the City's actions were not so outrageous as to support our intervention for a third time in its attempts to revitalize the Midwest City downtown area.

## CONCLUSION

¶ 40 The legislative nature of the blight determination ends any argument that the landowner's due process rights were infringed.[53] The landowner was afforded all constitutional protections available during the condemnation proceedings. The City complied substantially with the statutory requirements of 11 O.S.2002 § 38–106(B).[54] There is ample evidence that the project area suffered from blight. Therefore, we uphold the trial court's rulings and determine that the motion for oral argument should be denied.[55]

**REQUEST FOR ORAL ARGUMENT DENIED; AFFIRMED.**

WINCHESTER, C.J., EDMONDSON, V.C.J., HARGRAVE, WATT, TAYLOR, COLBERT, REIF, JJ., concur.

KAUGER, J., concurs in part and dissents in part.

OPALA, J., with whom KAUGER, J., joins, dissenting

¶ 1 I am no longer able to accede to the view a municipality's declaration that an area of the city is affected by blight is a **legislative act** which need not be preceded by personal notice to land owners within the territory included in the area and by an opportunity to contest the new status sought to be imposed upon the property. Because the described municipal declaration **immediately and directly** subjects the property located within the declared blight-affected territory to a forced sale, it must be preceded by a meaningful opportunity to the owners to defend against and contest the action that will expose their land to immediate law-compelled alienation.

¶ 2 One's claim to the protection of due process will not be defeated by a clever use of word games.

A. Well, this is—this is just an example of some standing water, the lack of proper storm water runoff, collecting water and getting it off—off the property.

51. *McConnell v. Town Clerk of Tipton*, 1985 OK 61, ¶ 18, *704 P.2d 479*

52. *McConnell v. Town Clerk of Tipton*, see note 51, supra; *Farmer v. City of Sapulpa*, 1982 OK 58, ¶ 12, 645 P.2d 518.

53. *Southwestern Bell Telephone Co. v. Oklahoma Corp. Comm'n*, see note 26, supra.

54. Title 11 O.S.2001 § 38–106(B), see note 4, supra.

55. Our holdings in the consolidated appeals are based on Oklahoma law constituting separate, adequate, and independent state grounds for our decision. *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).